Joann GRAHAM, et al.,

v.

## EVANGELINE PARISH SCH. BOARD, et al.

### No. CIV.A. 11,053.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

Sept. 1, 2004.

Murphy W. Bell, Baton Rouge, LA, Margrett Ford, Shreveport, LA, Marion Overton White, White & Pitre, Opelousas, LA, Norman J. Chackin, N A A C P Legal Defense & Educ Fund, New York, NY, for Joann Graham, Plaintiff.

Janice E. Hebert, U.S. Attorneys Office, Lafayette, LA, Katherine W. Vincent, U.S. Attorneys Office, Michael D. Skinner, Onebane Law Firm, Lafayette, LA, Lisa M. Taylor, U.S. Dept. of Justice Civ Rights Div., Washington, DC, I. Jackson Burson, Jr., Burson & Ortego, Eunice, LA, Donald Soileau, Soileau Law Office, B.J. Manuel, Daniel J. McGee, Mamou, LA, for United States of America, Basile School District Number Seven Bi–Racial Committee on Education Acadia & Evangeline Parishes Louisiana, Lawrence Vizinat, United States of America, Intervenor Plaintiffs.

C. Brent Coreil, D A's Office 13th J D C, J. William Pucheu, D A's Office 13th J D C, Ville Platte, LA, Robert L. Hammonds, Hammonds & Sills, Baton Rouge, LA, for School Board of Evangeline Parish, Defendant.

Richard Phillip Ieyoub, Couhig Partners, New Orleans, LA, for LA State Board of Education, Intervenor Defendant.

Edwin W. Fleshman, Taylor Porter et al., Baton Rouge, LA, Fred H. Sutherland, Beard & Sutherland, Shreveport, LA, for Capital City Press, Evangeline Parish Chapter National Association of Neighborhood Schools, James Kirt Guillory, Randy McCaulley, Eric Kent Guillory, Greg Ardoin, Jeff LeBlanc, Eddie Douglas, Gail McDavid, Matt Marcantel, Joycie Mae Thomas, Odelia A Boykins, Steven Craig Thibodeaux, Leah D Duplechain, Lucy Jones Green, Joseph Eugene McDavid, Movants.

WRITTEN REASONS FOR THE ISSU-ANCE OF THIS COURT'S MARCH 26, 2004 ORDER DENYING MOTION TO INTERVENE PURSUANT TO RULE 24(a) AND 24(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE FILED ON BEHALF OF THE EVANGELINE PARISH CHAPTER OF THE NATIONAL ASSOCIATION OF NEIGHBORHOOD SCHOOLS

REPRESENTED BY ITS DULY AUHORIZED PRESIDENT KIRT GUILLORY, JAMES KIRT GUILLORY, RANDY MCCAULLEY, ERIC KENT GUILLORY, GREG ARDOIN, JEFF LEBLANC, EDDIE DOUGLAS, GAIL MCDAVID, MATT MARCANTEL, JOYCIE MAE THOMAS, ODELIA A. BOYKINS, STEVEN CRAIG THIBODEAUX, LEAH D. DUPLECHAIN, LUCY JONES GREEN AND JOSEPH EUGENE MCDAVID

MELANCON, District Judge.

## CONTENTS

  I. *INTRODUCTION* ...............................................410

 II. *THE SOLE LEGAL ISSUE BEFORE THE COURT* .......................411

III. *A UNITED STATES DISTRICT COURT'S DUTY IN A SCHOOL DESEGREGATION CASE* .............................................411

IV. *A THRESHOLD QUESTION* .........................................412
    A. *A Suggested Answer* .......................................413
    B. *The Court's Perspective In Suggesting An Answer* ..........413

 V. *THE WRITER'S PERCEPTION OF THE HISTORICAL BASIS FOR THE SUGGESTED ANSWER* ...........................................413

VI. *THE HISTORY OF THE EVANGELINE PARISH DESEGREGATION CASE BASED ON THE COURT RECORD* .............................417
    A. *1965–1969* ...............................................417
    B. *1969—The Evangeline Academy* .............................419
    C. *1970–1972* ...............................................419
    D. *1975–1987* ...............................................420
    E. *1987–1992* ...............................................420
    F. *1993–1994* ...............................................421
    G. *1995—September 16, 1996* .................................421

VII. *SEPTEMBER 17, 1996—MAY 10, 2001* .............................422

VIII. *THE SUPERSEDING CONSENT DECREE OF June 28, 2001* .............423
    A. *The United States' Motion Of May 11, 2001* ..............423
    B. *The Status Conference of May 30, 2001* ..................423
    C. *The Court's Actions Subsequent To The May 30, 2001 Status Conference And Prior To The Signing Of The Superseding Consent Decree* ...................................................424

D.   The Provision Of The Superseding Consent Decree . . . . . . . . . . . . . . . . . . . . . . .424
E.   The Court's Rationale In Insisting That Certain Provisions Be
     Included In The Superseding Consent Decree . . . . . . . . . . . . . . . . . . . . . . . . . .426

IX.  MAY 31, 2001—MARCH 26, 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .426
A.   The School Board's August 15, 2001 Rejection Of Marvelyn Harris To
     Be Principal At Pine Prairie High School. . . . . . . . . . . . . . . . . . . . . . . . . . . .426
B.   The Quarterly Meetings With the President Of The School Board, The
     Superintendent Of Schools, The Attorneys For The Parties And The
     President Of The Evangeline Parish Chapter Of The NAACP . . . . . . . . . . .428
C.   The National Association For Neighborhood Schools ("NANS") And
     The Evangeline Chapter Of NANS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .429
D.   The Superintendent's Committee's Plan For The Reorganization Of
     The Evangeline Parish Schools And The School Board's Response
     Thereto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .430
E.   The Hearing On Applicants For Intervention's Motion To Intervene
     And The Court's Order Denying The Motion . . . . . . . . . . . . . . . . . . . . . . . . .431

X.   THE MOTION TO INTERVENE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .431
A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .431
B.   Findings of Fact and Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . .432
     1.   FRCP 24(a)—Intervention as of Right . . . . . . . . . . . . . . . . . . . . . . . . . . .432
          a.   Whether Applicants for Intervention Have a Legally
               Cognizable Interest in the Subject Matter of the Underlying
               Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .433
          b.   Whether Applicants for Intervention's Interest is Inadequately
               Represented by the Existing Parties to the Suit. . . . . . . . . . . . . . . .434
               i.   Adversity of Interest, Collusion, or Nonfeasance . . . . . . . . . . . . .436
     2.   Rule 24(b)—Permissive Intervention. . . . . . . . . . . . . . . . . . . . . . . . . . . .440

XI.  WHEN WILL THIS CASE COME TO AN END?  WHEN WILL THE
     EVANGELINE PARISH SCHOOL SYSTEM BE DECLARED
     UNITARY?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .440

XII. THE MEANING OF GOOD FAITH IN THE CONTEXT OF A SCHOOL
     DESEGREGATION CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .441

XIII. EVIDENCE OF GOOD FAITH SINCE THE ENACTMENT OF THE
     JUNE 28, 2001 SUPERSEDING CONSENT DECREE . . . . . . . . . . . . . . . . . . . .442
A.   The Evangeline Parish School Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .442
B.   A Missed Opportunity by the Evangeline Parish School Board . . . . . . . . . . . .443
C.   School System Administration—Superintendent Of Schools, Rayford J.
     Fontenot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .444

XIV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .445

## I.

### INTRODUCTION

The matter before the Court in this thirty-nine year old school desegregation case is a Motion to Intervene, R. 71, filed September 18, 2003 by the Evangeline Parish Chapter of an organization known as the National Association of Neighborhood Schools ("NANS") and eleven Caucasian and three African–American citizens of Evangeline Parish, Louisiana. The Evangeline Chapter of NANS was formed on March 23, 2003 by ten Caucasian citizens from Evangeline Parish with its stated purpose:

... as a united effort by Evangeline Parish parents and guardians of students of all races and nationalities to preserve wherever legally possible the right of parents to send their children to, and all of the students to attend, the public school closest to their homes as opposed to being mandatorily assigned to particular schools on the basis of racial, ethnic or socioeconomic factors.

The original plaintiffs, R. 80, and the United States of America through the Department of Justice, R. 87, filed oppositions to the Motion to Intervene. The Evangeline Parish School Board filed a Response to the Motion to Intervene stating that while "its members have adequately represented their constituents (including the Applicants) to the best of their abilities and will continue to do so... the School Board raises no objection to the motion." R. 88.

On March 16, 2004, at the conclusion of a two day hearing, the Court denied Applicant's Motion To Intervene. R. 130, p. 548. In denying the Motion, the Court stated that, based on what the Court perceived to be the sincere, heartfelt, but misguided testimony of the Applicants for Intervention, it owed Applicants a written ruling detailing the basis for the denial of their Motion, which in part would contain a synopsis of the record of the history of this thirty-nine year old case. The Court further stated that the members of the Evangeline Parish School Board and all of the citizens of Evangeline Parish were owed such a writing. *Id.*

## II.

### THE SOLE LEGAL ISSUE BEFORE THE COURT

The sole legal issue before the Court and the sole legal issue that is intended by the Court to be addressed in this ruling is Applicants for Intervention's ability to intervene in this case pursuant to Rule 24(a) of the Federal Rules of Civil Procedure "joinder as a matter of right" and/or Rule 24(b) "permissive joinder." The Court's finding of facts, conclusions of law and ruling are set out below in Section IX.

The balance of this narrative is written for Applicants for Intervention, members of the Evangeline Parish School Board, the Evangeline Parish School System's central office staff, principals, teachers and the citizens of Evangeline Parish, particularly those who were born after 1955, who choose to read it. In the event that the undersigned life-tenured Judge is not the last United States District Judge to preside over this case, it is also intended to assist the succeeding judge in the discharge of that judge's duties under his or her Oath of Office to uphold the Constitution of the United States of America.

## III.

### A UNITED STATES DISTRICT COURT'S DUTY IN A SCHOOL DESEGREGATION CASE

Those unfamiliar with the terms may want to keep in mind the two types of segregation as he or she reads these pages. *De facto segregation* is segregation that occurs without state authority, usually but not always on the basis of socioeconomic factors; *de jure segregation* is segregation that is (was) permitted or required by law. In the context of this school desegregation case, it is *de jure segregation* that is the concern of the Court.

A United States District Court's duty under *Brown v. Board of Ed. of Topeka, Shawnee County, Kan.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*) and *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*) and their progeny is:

(1) To dismantle root and branch the vestiges of the previously operated segregated dual school system[1] "with all deliberate

---

1. *Green v. County School Board of New Kent County, Virginia, et al,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (School boards are "charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."); *Swann v. Charlotte–Mecklenburg Bd. of Ed.,* 402 U.S. 1, 26, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Hull v. Quitman County Bd. of Educ.,* 1 F.3d 1450, 1458 (5th Cir.1993); *U.S. v. Lawrence County School Dist.,* 799 F.2d 1031 (5th Cir. 1986); *Williams v. City of New Orleans,* 729 F.2d 1554 (5th Cir.1984); *United States v. CRUCIAL,* 722 F.2d 1182 (5th Cir.1983); *Davis v. East Baton Rouge Parish School Board,* 721 F.2d 1425, 1435 (5th Cir.1983); *Ross v. Houston Independent School District,* 699 F.2d 218, 225 (5th Cir.1983); *United States v. Texas Educ. Agency,* 647 F.2d 504 (5th Cir.1981); *Valley v. Rapides Parish School Bd.,* 646 F.2d 925, 926 (5th Cir. 1981); *United States v. Bd. of Educ.,* 576 F.2d 37 (5th Cir.1978) (per curiam); *United States v. DeSoto Parish School Bd.,* 574 F.2d 804 (5th Cir. 1978); *Mannings v. Board of Pub. Instruction,* 427 F.2d 874 (5th Cir.1970); *United States v.*

speed."[2]

(2) To eliminate both the *de jure* segregation and the vestiges of that segregation to the extent practicable.[3]

(3) To further the return of the school system to local control, in this case, to the Evangeline Parish School Board.[4]

Upon a finding that a previously segregated school system has been dismantled, and is thus constitutional, the United States District Court presiding over the case is to declare the school system unitary and is to dismiss the case.[5] In the discharge of its duty to dismantle the previously operated segregated school system and to return the school system to local control, a District Court is to consider, among other things, issues that have come to be known as the *"Green* factors."[6] The *Green* factors must be met before a school system may be declared to be unitary and are generally thought to include the following: (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; (5) student assignment; and (6) curriculum.[7]

A United States District Court may find that one or more of the *Green* factors has been met; thus, a school system may be granted partial unitary status as to that or those factor(s).[8] Crucial to any finding of unitary status or of partial unitary status is a finding by the District Court that the school system has demonstrated "good faith" in the discharge of its obligations pursuant to the orders of the Court under which it had been operating to dismantle the vestiges of the previously operated segregated dual school system.[9] The meaning of good faith in the context of a school desegregation case is the subject of Section XI.

## IV.

### *A THRESHOLD QUESTION*

With the duty of a United States District Court in a school desegregation case such as this case in mind, how is it that after more than thirty-nine years and four life-tenured United States District Judges, including the present judge, the Evangeline Parish School

*Hinds County School Bd.*, 417 F.2d 852, 855 (5th Cir.1969); *Henry v. Clarksdale Municipal Separate School Dist.*, 409 F.2d 682, 694 (5th Cir. 1969); *Broussard v. Houston Independent School Dist.*, 403 F.2d 34 (5th Cir.1968); *Board of Public Instruction of Duval County, Fla. v. Braxton*, 402 F.2d 900, 908 (5th Cir.1968); *Adams v. Mathews*, 403 F.2d 181 (5th Cir.1968).

2. *Brown II*, 349 U.S. at 301, 75 S.Ct. 753; *Griffin v. County School Board of Prince Edward County*, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256 ("The time for mere 'deliberate speed' has run out... the obligation of school districts once segregated by law [is] to come forward with a plan that 'promises realistically to work, and promises realistically to work now.' "); *Tasby v.Estes*, 517 F.2d 92, 109 (5th Cir.1975) (The "all deliberate speed" timetable has been superseded and the Supreme Court has made it clear that "under explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools.") (citation omitted).

3. *Missouri v. Jenkins*, 515 U.S. 70, 88–89, 101, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995); *Freeman v. Pitts*, 503 U.S. 467, 490, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

4. *Dayton Bd. of Ed. v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979)(the

court has the obligation not to take any action that would impede the process of disestablishing the dual system and its effects); *Monroe v. Board of Comm'rs of Jackson*, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (This obligation requires the court to review school-board actions to ensure that each one "will further rather than delay conversion to a unitary, nonracial nondiscriminatory school system.")

5. *Milliken v. Bradley*, 433 U.S. 267, 280–281, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)(the court's end purpose must be to remedy the violation and to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution).

6. *Green v. County School Board of New Kent County, Virginia, et al*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

7. *Green*, 391 U.S. at 435, 88 S.Ct. 1689; *Singleton, et al v. Jackson Municipal Separate School District, et al*, 426 F.2d 1364 (5th Cir.1970).

8. *Freeman v. Pitts*, 503 U.S. 467, 490–91, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

9. *Green*, 391 U.S. at 439, 88 S.Ct. 1689 (1968); *Freeman*, 503 U.S. at 491, 112 S.Ct. 1430; *Ross v. Houston Independent School Dist.*, 699 F.2d 218, 225 (5th Cir.1983).

System has not been declared unitary or at least partially unitary?

### A. A Suggested Answer

It is not because, as is clearly evidenced by this case's musty old record, that for much of its life previous school boards, superintendents, administrators and many Evangeline Parish parish-wide elected officials, assisted initially by the State of Louisiana, did all that they could to maintain a segregated school system. Nor is it because those elected and other officials gave up only begrudgingly, bit by bit, and only when forced to do so by the threat of action or by the action of the United States Department of Justice, this Court, or the United States Court of Appeals for the Fifth Circuit. Neither is it because for many periods during the case's history the United States Department of Justice abandoned it. It is because the United States District Judges that previously presided over this case and the undersigned United States District Judge for the first four and one-half years after the case had been assigned to him, did not do all that *could* have been done or all that *should* have been done to transform the Evangeline Parish School System to a unitary system in which *de jure* segregation and its vestiges, to the extent practicable, would be eliminated.

### B. The Court's Perspective In Proposing The Suggested Answer

There may be no one valid answer as to why, after thirty-nine years, the Evangeline Parish School System has not been declared unitary or at least partially unitary. It might be argued that the only answer one is capable of giving is based on his or her own unique perspective. Indeed, it has been suggested that "[r]eality happens to be, like a landscape, possessed of an infinite number of perspectives ... The sole false perspective is that which claims to be the only one there is." [10] It is not the Court's intention to intimate that its suggested answer is "the answer" or that other reasonable people of good faith might not come up with different answers that are equally veracious and authentic. Also, most people would probably agree that it is extremely difficult at best to pass judgment on events of the past through the lens of the present.

The undersigned *believes,* and therefore, offers the following explanation for the suggested answer based on his own unique perspective,[11] a careful review of the thirty-nine year old record of the case, having presided over the case since September 17, 1996 and his experience in other school desegregation cases since assuming the Federal Bench on February 12, 1994.[12] The suggested answer may apply to many of the forty of Louisiana's sixty-eight school districts that remain, over fifty years after *Brown,* under Federal Court supervision.

### V.

### THE WRITER'S PERCEPTION OF THE HISTORICAL BASIS FOR THE SUGGESTED ANSWER

During the late 1950's, the 1960's and the early 1970's, lawyers with the United States Department of Justice and the Department of Health, Education and Welfare, generally but not always from Washington, D.C., journeyed to Louisiana and to the other Southern states to force the white power structures, state and local, to obey the *law of the land* [13]

---

10. José Ortega y Gasset.

11. Born in 1946; being reared in neighboring Avoyelles Parish; graduating in 1964, ten years after the *Brown* decision, from a segregated public high school in Bunkie, a community that is eighteen miles from Ville Platte, the parish seat of Evangeline Parish; and, having practiced law in Marskville, a community that is 35 miles from Ville Platte for in excess of twenty years.

12. *United States v. Franklin Parish,* CV15632; *Lemmon v. Bossier Parish,* CV10687; *Taylor v. Ouachita Parish,* CV12171; *Graham v. Evangeline Parish,* 65CV11053; *Monteilh v. St.Landry Parish,* 65CV10912; *Davis v. East Baton Rouge Parish School Board,* CV56–1662 (M.D.La)(Court appointed mediator).

13. In an opening salvo to desegregate the schools of the South consistent with *Brown,* on September 25, 1957 President Dwight David Eisenhower nationalized the Arkansas National Guard to assist in the implementation of a United States District Judge's order to integrate Little Rock Arkansas' schools and to protect the physical safety of nine African–American students as they integrated Central High School.

as enunciated in *Brown* and the cases that followed. Lawsuits were filed by the United States in the United States District Courts of Louisiana and across the South. In other instances, as in this case, the United States intervened in an existing lawsuit that had previously been filed by African–American citizens. This lawsuit was filed on May 4, 1965 by Joann Graham and Collins Graham, represented by their father, James Graham, and by James Williams, Jr., Benjamin Williams and Hester Ruth Williams, represented by their father, James Williams, Sr. On June 4, 1965, this Court found the Evangeline Parish School Board to be in violation of the United States Constitution by operating its schools on a segregated basis. The United States through the Department of Justice was allowed to intervene on August 28, 1969.

In Evangeline Parish, the white power structure, the Evangeline Parish School Board and many of Evangeline Parish's parish-wide and other elected officials, with the assistance of the State of Louisiana, resisted with a vengeance. If judged by today's standards, that resistance is hard to fathom as having ever been official school district or state policy. Those of us who were alive at the time, who happen to be Caucasian, who are native of the South in general, and of Louisiana in particular, should not only be less than proud of, should not only be sorry

for, but should be *ashamed* of the actions taken in our names by the white elected leaders of the day and their designees in thwarting the rule of law and subjecting African–American citizens to blatant and invidious discrimination, in violation of the Constitution of the United States of America, solely because of the color of their skins.[14]

The Court's record of this proceeding, as well as the recorded cases [15] in which the Evangeline Parish School System was involved, while not exhibiting the violence that occurred in many of Louisiana's parishes in the desegregation of their public school systems, clearly reflects that at least a majority of the Evangeline Parish School Board, supported by most local and state officials of the day, systematically did what they could to impede the enforcement and implementation of *Brown* to maintain a segregated school system.

By the mid 1970's, most of the routine desegregation litigation across the South had ended through trials in the United States District Courts with unsuccessful appeals by the local school districts to the United States Court of Appeals for the Fifth Circuit or by District Court adoption of a Consent Decree between the United States and a school district. The Justice Department attorneys had, by and large, returned to Washington, D.C. or from wherever else they had come.

---

14. Incredibly, it was only this year, on June 4, 2004, fifty years and seventeen days after the United States Supreme Court's unanimous decision in *Brown*, that the Louisiana Legislature passed, and Louisiana's first female Governor, Kathleen Babineaux Blanco, signed Act 135 and Act 449 removing Jim Crow school segregation laws from the statutes of Louisiana. Act 135 repeals La.R.S. 17:335, *allowed school officials and teachers to draw pay even though imprisoned for action relating to integration of public schools*, and La.R.S. 17:349.2, *allowed governor to take over public schools to "promote the health, peace and morals" of the community and to close the schools temporarily or permanently if "such schools may not be operated on a racially segregated basis."* Act 449 repeals La.R.S. 17:52.2, *operation of schools in violation of state law is grounds for removal of school board members*, 17:171 *allowed governor to close public schools to "prevent disorder, riots or violence that would threaten, interfere with or disrupt the operation thereof,"* 17:172, *public schools to be operated in accordance with the state constitution and laws,*

17:173, *students may not obtain credit from public school classes that do not comply with the state constitution and laws*, 17:335, *allowed school officials and teachers to draw pay even though imprisoned for action relating to integration of public schools*, 17:429, *revoked public school teacher's teaching certificate for instruction in violation of state constitution and laws*, 17:430 *revoked trade or vocational school teacher's teaching certificate for instruction in violation of state constitution and laws*, and 17:349.1 through 17:349.5 and 17:350.2 through 17:350.14, *which included obsolete provisions relative to the operation of schools and trade or vocational schools on a segregated basis.*

15. *Graham v. Evangeline Parish School Bd.*, 485 F.2d 687 (5th Cir.1973); *Hall v. St. Helena Parish School Bd.*, 417 F.2d 801 (5th Cir.1969); *Jones v. Caddo Parish School Bd.* 392 F.2d 721 (5th Cir.1968); *Conley v. Lake Charles School Bd.*, 303 F.Supp. 394 (W.D.La.1969); *Trahan v. Lafayette Parish School Bd.*, 244 F.Supp. 583 (W.D.La.1965).

In this case, the Evangeline Parish School Board was first ordered to fulfill its constitutional obligation to provide a completely integrated school system by decree entered on August 5, 1969. As the United States Supreme Court in *Brown* and the cases that followed had not laid out a road map for a United States District Judge to follow in dismantling the previously segregated school systems, the details of the various judgments and consent decrees were tailored to meet the individual circumstances of the particular school district by the presiding judge.

Many times, as in this case, the school district had the obligation to make periodic reports to the United States Department of Justice and/or to the Court as to the progress the school district was making in satisfying the district's constitutional obligation to desegregate its school system. The Evangeline Parish School Board is required to submit two annual reports on June 1st and October 15th of each year. These periodic reports have come to be known as *Hinds County* reports because of the approval of their use in *United States v. Hinds County School Board*, 433 F.2d 611, 618–19 (5th Cir.1970).[16] The items to be addressed by Evangeline Parish School Board in its semi-annual reports include:

(1) the name, race, grade and subject taught by each teacher employed in the school system;

(2) the name, race and subject taught for all teachers employed the previous school year but not re-employed, the reason for their termination, and the name and race of the teachers employed as replacements for those teachers;

(3) the name, race, and title for all incumbents of professional and administrative positions employed in the school system;

(4) the name, race, and title for all incumbents of professional and administrative positions employed the previous school year but not re-employed, the reason for their termination, and the name, race, and title of the professionals and administrators employed as replacements;

(5) the number of vacancies, position, title and location of each to be filled for the upcoming school term;

(6) the name, race, and grade or subject taught of each teacher proposed to be employed for the following school year, by school;

(7) the name, race, and title for each incumbent of professional and administrative positions proposed to be employed for the following school year;

(8) the number of students by race enrolled in the school district;

(9) the number of students by race enrolled in each school of the district;

(10) description of the requests and the results which have accrued by race under the Majority–to–Minority student transfer provision;

(11) the number of inter– and intra-district student transfers granted, including race of student, and names of the sending and receiving school/district;

(12) whether the transportation system for the school district is desegregated to the extent that Caucasian and African–American students are transported daily on the same buses;

(13) whether the facilities, such as gymnasiums, auditoriums and cafeterias are being operated on a desegregated basis;

(14) description and location for any current or proposed construction, modification or expansion of facilities;

(15) whether the School Board has sold or abandoned any school facility, equipment or supplies having a total value of more than $1,000.00; and

(16) the purpose and function of the Biracial Committee, their recommendations, and actions taken based on their recommendations. *R. 17* (June 28, 2001 Superseding Consent Decree).

The record of this case clearly demonstrates that the United States Department of

---

**16.** The obligation of the Evangeline Parish School Board to submit *Hinds County* reports was originally set out in the August 5, 1969 Decree and was continued as set out in the Consent Decrees of August 1, 1997 and October 21, 1998 and in the Superseding Consent Decree of June 28, 2001.

Justice attorneys in Washington assigned to this case initially, carefully reviewed the *Hinds County* reports that were submitted by the Evangeline Parish School Board. However, it is painfully clear from that same record that at some point scrutiny of the *Hinds County* reports by the Department of Justice was much less than rigorous, or non-existent. Over the ensuing years, Evangeline Parish School Board members, school superintendents, administrators, principals and teachers came and went, and were replaced one or more times. In Washington, the trial attorney for the Department of Justice, Civil Rights Division, assigned to a case changed numerous times. Political administrations in Washington D.C. changed every four or eight years. Institutional memory was lost.

As a general rule, a presiding United States District Judge has little or no contact with a school desegregation case assigned to him or her, unless the original plaintiffs and/or the United States Department of Justice or the school district place a motion before the Court to resolve an issue. In this case, sometimes with Court involvement, issues were also resolved between the parties, resulting in an order or an amended consent decree submitted jointly by the parties averting a formal hearing or trial to resolve the issue(s).

If one were to give the subject any serious thought, most reasonable people would *probably* realize that a school desegregation case is one of the most difficult types of case that can be placed on the lap of any United States District Judge; school desegregation cases involve people's most prized possessions, their children. Few things in a person's life, short of the immediate threat of death or serious bodily harm, cause a person to react like an issue that affects his or her children, especially an issue as important as the education of those children. It is a truism that most people will do for their children what they will not do for themselves.

It is also true that most United States District Judges have plenty of work to occupy their time. Judges do not go out and shop for business; thus, Court-initiated inquiry into the compliance or non-compliance of a school system's obligation in a school desegregation case is not only the exception rather than the norm, it is rare. That was certainly true of the way the undersigned discharged his duties in this case from the date it was assigned to him on September 17, 1996 until May 30, 2001. From the record, as well as the office files of previous United States District Judges, it was also the way predecessor judges discharged their duties in the case. Historically, the way the United States District Judges in this case were made aware of an issue of non-compliance by the Evangeline Parish School Board was by the Department of Justice and/or the original plaintiffs bringing a formal action against the School Board or by asking for a status conference to discuss an issue with the Court. At other times, the District Judges received letters from individual citizens, generally but not always, African–Americans, or from groups such as the National Association for the Advancement of Colored People (NAACP), bringing to the Court's attention alleged violations which in turn were sometimes referred to the United States Department of Justice for investigation and action if appropriate.

The effect of the labored procedure by which an issue or issues of School Board non-compliance has been presented to the presiding Judge in this case, and the occasional remedial or other action taken by the Court to remedy the violation, has caused time and time again turmoil within the Evangeline Parish School System, indeed within all of Evangeline Parish. Each such instance over the long history of this case can be analogized to the pulling off of a scab on a healing wound, allowing the wound to fester, become infected, thus delaying the day when the wound would finally heal. In the context of this school desegregation case, at times the remedial court action required was terrible for education in Evangeline Parish, terrible for race relations in Evangeline Parish and extended yet again the day when the Evangeline Parish School System would be able to meet its constitutional obligation and be released from Federal Court oversight.

On May 11, 2001, when the United States Department of Justice filed a motion for

status conference, which ultimately resulted in the Superseding Consent Decree of June 28, 2001, this Judge concluded that more direct and frequent oversight of the case was required *if* the Court was ever going to fulfill its duty to eliminate *de jure* segregation and vestiges of that segregation to the extent practicable within the Evangeline Parish School System.

It was also after the filing of the May 11, 2001 motion and prior to the entry of the Superseding Consent Decree of June 28, 2001, that the attorneys for the United States Department of Justice represented to the attorney for the School Board, the attorney for the original plaintiffs and to the Court that based on the history of the Evangeline Parish School System and the apparent lack of appreciation of the severity of the then existing situation, it was considering dropping what is considered in any school desegregation case, the "Nuclear Bomb," and came within a hair of filing a motion to place the twin issues of facilities and student assignment before the Court. Had such a motion been filed, it would have resulted in the court-ordered closing of schools and transfer of students. The only issue before the Court would have been its constitutional duty to implement a plan submitted by the Justice Department or created by the Court that brought the Evangeline Parish School System immediately into compliance with the requirements of *Brown* and its progeny.

The course of action that the Court has taken since May 30, 2001 is the subject of Section VII. For the present, suffice to say, it was at the status conference of May 30, 2001, with the attorneys for the parties, the members of the Evangeline Parish School Board, the acting Superintendent of the Evangeline Parish School System, the School System's central office staff, and the principals of the School System's fourteen schools, that the Judge realized the full extent of the problem the Court faced if it was ever going to discharge its duty under the United States Constitution in this case to eliminate, to the extent practicable, the *de jure* segregation and the vestiges of that segregation as it then existed in the Evangeline Parish School System. After the questioning of approxi-

mately thirty-five School System employees and the thirteen School Board members in attendance, no more than five had seen, much less read, the Superseding Consent Decree of October 21, 1998, under which the Evangeline Parish School System was then ostensibly operating. A new approach had to be found.

## VI.

### THE HISTORY OF THE EVANGELINE DESEGREGATION CASE BASED ON THE COURT RECORD

#### A. 1965–1969

On June 4, 1965, this Court found that the Evangeline Parish School Board had violated the Constitution by operating its schools on a segregated basis and ordered the School Board to prepare a desegregation plan within thirty days to be implemented "with all deliberate speed." 06/04/65 Order at 3; Bate stamp 22. On June 16, 1965, the Evangeline Parish School Board filed a "freedom of choice" plan which allowed for the desegregation of two grades, one and twelve, in September 1965, with all grades desegregated by September 1968. Plan for Integrating Evangeline Parish Schools; Bate stamp 30–41. The Court entered a judgment approving the plan on June 17, 1965. Order Approving Plan for Integration of Evangeline Parish Public School System; Bate stamp 43–44. The plaintiffs filed an appeal of this Court's judgment with the United States Court of Appeals for the Fifth Circuit. Following the decision of the Fifth Circuit in *Singleton, et al. v. Jackson Municipal School District, et al.*, 355 F.2d 865 (5th Cir.1966), on March 16, 1966, this Court entered an amended judgment requiring that the Evangeline Parish School System desegregation process be reached in all grades by the fall term of 1967 as required by *Singleton*. 03/16/66 Memorandum Opinion and Order, Bate stamp 82–86.

On May 28, 1969, the Fifth Circuit remanded the case to this Court with instructions to enter an order adopting a desegregation plan in conformity with the requirements enunciated by the Supreme Court in *Green v. County School Board*, 391 U.S. 430, 88 S.Ct.

1689, 20 L.Ed.2d 716 (1968) and substitute such plan for the School Board's plan employing freedom of choice procedures. Bate stamp 46. Pursuant to the remand, on August 5, 1969, over the objections of the School Board, the Court entered a Decree implementing the plan prepared by the United States Office of Education, Department of Health, Education and Welfare and ordered the immediate implementation of the desegregation plan for the 1969–70 school term. 08/07/69 Decree; Bate stamp 495–509. Prior to the Court's August 5, 1969 order, on July 18, 1969, the Evangeline Parish School Board filed a motion to continue under the existing plan as amended by this Court in 1967, the identical plan which the Fifth Circuit had held specifically could no longer be employed by the School Board. 07/18/69 Motion, Bate stamp 483–84. In its August 5, 1969 order, the Court indicated that the School Board's motion "was frivolous, and called into serious question the good faith of the defendant board." 08/05/69 Order; Bate stamp 509. Thereafter, the School Board petitioned the United States Supreme Court for a writ of certiorari to review the ruling of the Fifth Circuit and also applied twice to the Fifth Circuit to stay its ruling pending the Supreme Court's decision. Bate stamp 617. Both applications for stay were denied and the Supreme Court denied the writ. *Id.*

Prior to the opening of the 1969–70 school session, a suit was filed on August 28, 1969 in the local state district court in Ville Platte by 115 people seeking to enjoin the Evangeline Parish School Board from implementing the desegregation plan ordered by this Court. On that same day, the United States filed a motion in this Court for appointment and designation as *amicus curiae* or friend of the Court. Petition for Removal and Consolidation, Bate stamp 547–48. The Court granted the United States' motion "in order to maintain and preserve the due administration of justice and the integrity of the judicial process" and removed the state court litigation to this Court, consolidating it with this case. 09/28/69 Order, Bate stamp 558–59.

On September 2, 1969, all public schools in Evangeline Parish were officially opened, with only 20% of the students in attendance.

At a School Board meeting conducted that night, the School Board passed a resolution closing schools. On September 6, 1969, the United States filed an Application for Order to Show Cause Why Defendants Should Not Be Held in Civil Contempt. Bate stamp 616–19. Also on that date, the Court entered an order and set a show cause hearing on September 15 for each of the School Board members to show cause why they should not be held in contempt for failure to obey the Court's August 5, 1969 Order. 09/06/69 Order to Show Cause, Bate stamp 620–21. The schools remained closed for one week until this Court issued a temporary restraining order on September 9, requiring the Board to reopen the schools by September 12, 1969. 09/09/69 Temporary Restraining Order, Bate stamp 637–38. In light of the Court's order and the ultimate reopening of Evangeline Parish schools on September 12, on September 13, the United States moved to continue the contempt show cause hearing for the members of the Evangeline Parish School Board. 09/13/69 Motion for Continuance, Bate stamp 652–53. On September 17, 1969, this Court ordered that the Temporary Restraining Order dated September 9, 1969 be extended to September 29, 1969. 09/17/69 Order, Bate stamp 668–69. Thereafter, on September 29, 1969, the Court entered a preliminary injunction enjoining the School Board members and the Superintendent of the Evangeline Parish School System from failing or refusing to continue full operation of the Evangeline Parish public school system. 09/29/69 Order, Bate stamp 747–50. Subsequently on October 1, 1969, over the School Board's objection, this Court further ordered the School Board and the Superintendent to show cause on October 30, 1969 why the preliminary injunction should not be made permanent. Rule Nisi and Pretrial Order, Bate stamp 764–66. Following the October 30 hearing to show cause, this Court issued its ruling on December 5, 1969. Findings of Fact and Conclusions of Law and Order, Bate stamp 917–23. The Court held that the September 2, 1969 resolution passed by the Evangeline Parish School Board to close the schools "had the effect, of frustrating the implementation of the Order of this Court entered August 5, 1969," and as the

resolution had not been rescinded, and therefore, continued to bind the School Board, the Court was required "as a matter of law to issue a permanent injunction." *Id.*

### B. 1969—The Evangeline Academy

With the reopening of school on September 12, 1969, a large percentage of white students, particularly in the Ville Platte area, did not enroll in the public schools. On September 24, 1969, the Evangeline Academy was incorporated, and on October 20, 1969, students began attending classes in several temporary and renovated structures at several locations in and around Ville Platte. The school, which enrolled 2,149 white students in grades 1–12, and employed 81 white teachers, was comprised 99% of Evangeline Parish residents. The white flight from the Evangeline Parish School District resulted in a substantial decline in the School System's enrollment, most notably in Ville Platte. For the Ville Platte area schools, the white student enrollment declined from 2,056 students in the 1968–1969 school year to 440 students in the 1969–1970 school year. The number of black students remained substantially the same during this period. In the 1970–71 school year, the Evangeline Academy enrolled 1868 students, all white, while the number of white students in the Ville Platte area public schools increased slightly to 597.

### C. 1970—1972

On May 11, 1970, the Evangeline Parish School Board filed a motion to modify the plan of operation in the August 5, 1969 Decree. Petition for Modification of Judgment, Bate stamp 950–88. The School Board submitted "two (2) plans, enumerated as Plan A and Plan B which were formulated as a result of a study and recommendation by a bi-racial committee appointed by Evangeline Parish School Board for the Ville Platte School District, Ward One, Evangeline Parish." *Id.* Following the filing of the School Board's motion, on May 21, the Court ordered the School Board to submit its proposed modified plan or plans of operation to the Department of Health, Education and Welfare for consideration and study. 05/21/04 Order, Bate stamp. The Court further ordered the Department of Health, Education and Welfare to involve the parties to the litigation in any modifications it made to the proposed modified plan. *Id.* This Court issued its memorandum opinion and order on July 6, 1970. Memorandum Opinion and Order, Bate stamp 1110–16. While the Court recognized that the School Board was "seriously concerned with the deterioration of the Ville Platte Area Schools" and both plans were "designed to draw white students back into the school system in the Ville Platte Area," the Court denied the School Board's motion, finding that "implementation of the HEW plan in accordance with our former decree seems to be the most effective method of converting these schools to a unitary method of student assignment." 07/06/70 Order, Bate stamp 1110–16. The Court determined that because both of the plans would create large numbers of students who would be unassigned to schools in Ward 1 (Ville Platte), the result would "effectively and predictably" be that "the James Stephens High School remaining an all black school percentagewise [sic] under the standards set by *Green, supra,* (15% or less white)." *Id.* On August 3, 1970, the School Board filed a second petition for modification of the August 5, 1969 Decree attaching a third plan for the operation of schools in the Ville Platte area. Second Petition for Modification of Judgment, Bate stamp 1118–21. This Court denied the motion on August 5, stating that "[i]n view of the short time remaining before the opening of schools in this parish, we... find that it does not meet with constitutional requirements and, therefore, must be rejected." *Id.* The Court also ordered that the School Board was to "forthwith make teacher assignments for each school in the system as required by our Decree of August 5, 1969" and "file with the Clerk of this Court and distribute to all schools and principals of schools in the system the report required to be filed by paragraph VIII(A), which report was required to be filed on or before June 1st of this year and is now delinquent, setting forth in the detail required by said Decree the assignment of each teacher proposed to be employed for the 1970–71 school year for each school in said system." *Id.* The School Board filed the June 1 report required by the

Decree on October 9, 1970. Bate stamp 1175–82.

On March 9, 1971, the United States filed a Complaint in Intervention to enjoin the Evangeline Parish School Board from "frustrating and circumventing this Court's order of August 5, 1969" by providing financial or material support in the form of textbooks, supplies and transportation to Evangeline Academy since the beginning of the 1969–70 school year. Motion for Leave to Intervene, Bate stamp 1184–92. The Court granted the United States' motion to intervene on July 9, 1971. 07/09/71 Order, Bate stamp 1446–47. Following an August 3, 1971 evidentiary hearing, on July 28, 1972, almost one year later, the Court denied the United States' motion to enjoin the School Board from providing textbooks and supplies and granted the motion to enjoin the School Board from providing transportation. The Court found that "[t]he [transportation] system remains substantially as it was prior to this Court's order of August 5, 1969 which required the dismantling of the dual transportation system. The buses are virtually all white or all black, particularly in the Ville Platte area." 07/28/72 Ruling, Bate stamp 1661–66. The Court ordered the School Board to submit an integrated transportation plan within ten (10) days of the date of the order. *Id.* The School Board filed its integrated bussing plan on August 17, 1972. Bate stamp 1682–87. On August 23, 1973, the United States Court of Appeals for the Fifth Circuit reversed this Court's ruling on textbooks and supplies and remanded the case so that this Court could determine findings of fact specific to the textbook and transportation issues. Mandate, Bate stamp 1740–42. On December 30, 1974, almost one and one-half years after the Fifth Circuit decision, this Court entered an order temporarily enjoining the School Board from providing textbooks or transportation or any other public aid to children attending Evangeline Academy or to the Evangeline Academy. 01/30/74 Order, Bate stamp 1802–

03. On May 19, 1975, this Court ruled that its temporary order of December 30, 1974 be made permanent and the Evangeline Parish School Board was permanently enjoined from providing textbooks or transportation or any other public aid to children attending Evangeline Academy or to the Evangeline Academy. 05/19/75 Order, Bate stamp 1873–74.

### D. 1975–1987

Following the Court's May 19, 1975 Order until May 4, 1987, a period of twelve years, the record contains virtually no activity with the exception of the regular *Hinds County* reports filed by the School Board.[17] Bate stamp 2303.

### E. 1987–1992

Following an informal hearing held on May 4, 1987, the Court ordered, effective at the beginning of the 1987–88 school year, that all students in the Evangeline Parish School System must attend the school in the Ward of their domicile. 05/06/87 Order, Gov't Exh.1. On June 4, 1987, the Court amended its order adding five exceptions to the requirement that students attend school in their domiciliary Ward.[18] 06/4/87 Amended Order, Bate stamp 2307.

In a February 4, 1992 letter to the Evangeline Parish School Board and Superintendent of Schools Larry J. Broussard, this Court informed the School Board that it had been brought to the Court's attention that students zoned for Ward 1 in Ville Platte were attending schools in Vidrine and Bayou Chicot, as well as in St. Landry Parish. Gov't Exh.2. The Court cautioned the School Board that, "[i]f I receive any additional complaints thereafter [of such zone jumping], I will probably issue an order requiring all principals to execute sworn affidavits that they have no students in their schools who are out of zone and these affidavits will be filed into the record of the court in the event of the need for further action." *Id.*

---

**17.** The record includes no *Hinds County* reports following the one filed on January 4, 1985 until a report dated March 9, 1990 was filed.

**18.** The exceptions included: 1) students living in the Cazan's Lake area inaccessible to Ward 5; 2) the North/South attendance line between Wards

3 and 4; 3) the North/South attendance line between Wards 2 and 3; 4) more than one school in a Ward; and 5) currently enrolled students comprising the graduating class of 1988.

In August 1992, the Department of Justice informed the Evangeline Parish School Board Attorney of complaints alleging the Evangeline Parish School System's failure to comply with the Court's 1969 desegregation order by failing to enforce the zone lines, creating racially identifiable schools, assigning teachers on the basis of race and disparate treatment in the quality of resources provided to students. Gov't Exh.4. The Department of Justice investigated the Evangeline Parish School System and advised of the following concerns based on its July 1992 tour of the schools: 1) allowing impermissible student transfers; 2) existence of racially identifiable schools; 3) faculty assignments based on race, resulting in the percentage of African–Americans on the faculties at the majority of schools being less than 21%, the total of the minority faculty in the parish; 4) failure to maintain appropriate facilities conducive to a learning atmosphere at predominantly black schools, including unsanitary bathrooms at James Stephens, lack of a library at Ville Platte Lower Elementary School and improperly ventilated and poorly maintained classrooms at Ville Platte High School. *Id.* In December 1992 after reviewing the School Board's response to the foregoing concerns, the Department of Justice advised the School Board of its continuing concerns: 1) inadequate and legally unacceptable steps being taken to solve the impermissible student transfers; 2) overcrowding with a high number of portable classrooms at James Stephens Elementary with a black enrollment of 69% rather than sending students to Chataignier Elementary School, 32% black, Mamou Middle School, 33% black, or Vidrine Elementary School, 16% black, all of which are under capacity, and continuing disparities in the physical facilities of some predominantly black schools such as Ville Platte High School with water marks on the walls, peeling plaster and holes, auditorium floors needing cleaning and renovation, gym needing renovation, classrooms with cement floors, dilapidated desk and chairs, poorly equipped science lab and poorly stocked library; and 3) insufficient information being made available to assess School Board com-

pliance in the area of teacher assignments. Gov't Exh.5.

### F.  1993–1994

The Court record includes no documents, including *Hinds County* reports, or any indication of activity during 1993 or 1994.

### G.  1995—September 16, 1996

On January 3, 1995, a conference was held in the Court's chambers with the Superintendent of Evangeline Parish Schools, the President and some members of the Evangeline Parish Chapter of the NAACP. The Court expressed concern regarding the imbalance in the ratio of black/white teachers and administrators in the Evangeline Parish School System. 01/04/95 Minute Entry. Following an investigation of complaints alleging discriminatory practices, the Department of Justice advised the Evangeline Parish School Board in July 1995 that the School Board had not fully dismantled the prior dual system of public education. The Department of Justice listed the basis of its determination as follows: 1) 50% of the Evangeline Parish School System schools were "racially identifiable schools" as articulated by United States Court of Appeals for the Fifth Circuit, in that the racial percentage of the school's student enrollment was outside a range of 15% of the 1995 district wide student population, 58% white and 42% black, a pattern that had persisted since the inception of the desegregation order in 1969. Also, the Board's actions perpetuated a dual system of education by effectively maintaining the Ville Platte schools as predominantly black schools and the other six clusters of K–12 grades as predominantly white schools; 2) A disparate number of portable buildings existed at the predominantly black school sites with 55% of the district's portable teaching facilities located in the Ville Platte schools. The School Board responded to increased student enrollment at the Ville Platte schools by installing temporary/portable facilities while constructing permanent buildings in the predominantly white schools; 3) Failure to adequately address illegal student transfers with a clear comprehensive policy designed to resolve stated concerns and assist the school district in fulfilling its desegregation obligation. In-

vestigation revealed that illegal student transfers were approved contrary to the limited exceptions set out in the desegregation order, examples of which included allowing parents living within the Ville Platte zone to place trailer homes in another attendance zone and use the new address to substantiate residency, extending guardianships to relatives who live in other attendance zones with predominately white schools, use of fraudulent or unauthenticated utility bills and medical excuses to obtain student transfers. The committee to review and recommend transfer requests had no articulated standards and/or guidelines. The School Board's criteria permitting student transfers did not ensure that all students who may be improperly enrolled in schools because of illegal transfers had been identified and returned to their proper schools and failed to ensure that future transfers would be monitored so illegal transfers will not occur in the future. The Evangeline Parish School Board transfer policy deviated from the desegregation order and perpetuated a dual education system; 4) Ville Platte's predominantly black schools had less access to school faculty and staff than students attending predominantly white schools in the district; 5) Students attending predominantly black schools had been provided a significantly smaller share of the district's resources and equipment, including facility square footage per student, computers, library books, science laboratories, restroom fixtures, custodians and expenditures per school for building equipment, supplies, maintenance and utilities; 6) Although 38% of the students enrolled in the school system were assigned to Ville Platte schools in the 1992–93 school term, since 1986 less than 9% of the funds expended for school additions and renovations had been spent for the Ville Platte schools. The James Stephens School enrolled the second largest student population in the school system; however, the total money expended for the James Stephens School from 1979 to 1992 was $297,000.00, 8% of what was expended for the entire school system; 7) Notable disparities in the physical facilities existed at the predominantly black schools. 07/20/95 Letter from U.S.D.O.J. to counsel for Evangeline Par. Sch. Brd.

The Court met with the School Board Superintendent and counsel for the United States on May 21, 1996. 05/21/96 Memo of Meeting. The Court expressed concern as to the lack of African–Americans in supervisory positions. *Id.* On July 16, 1996, the Court met with the Evangeline Parish School Board and its Superintendent, Assistant Superintendent and attorney, as well as the attorney for the Department of Justice. 08/16/96 Memo of Meeting. The Court instructed the government to file its report as to its investigation of the Evangeline Parish School Board's compliance with the August 5, 1969 Decree by November 16, 1996. 07/16/96 Memo of Meeting.

## VII.

*SEPTEMBER 17, 1996—MAY 10, 2001*

This case was reassigned to the current Presiding Judge on September 17, 1996. The undersigned as Presiding Judge first met with the Evangeline Parish School Board, its attorney, the Superintendent and Assistant Superintendent on October 15, 1996. 10/16/96 Minute Entry. Following the October 15, 1996 meeting, the Court conducted meetings and status conferences in order to monitor the parties progress in developing an alternative plan to eliminate the vestiges of past discrimination based on the Department of Justice's investigation of the School System. 12/16/96 Memo of Conf; 01/29/97 Memo of Conf; 03/18/97 Memo of Conf; 05/02/97 Memo of Conf; 06/03/97 Memo of Conf; 07/18/97 Memo of Conf. On August 1, 1997, the Court approved a consent decree submitted by the United States and the Evangeline Parish School Board. Thereafter, on October 21, 1998, the Court approved a Superseding Consent Decree submitted by the United States and the Evangeline Parish School Board which addressed situations and applications not specifically addressed in the 1997 Consent Decree. 10/21/98 Superseding Consent Decree.

On May 11, 2001, the United States Department of Justice filed a motion to set a status conference. On May 30, 2001, the Court conducted a status conference with the thirteen members of the Evangeline Parish School Board, the acting Superintendent, the

School System's central office staff and the School System's fourteen principals. It was after the May 30 status conference, after conferring with the attorneys for the parties, that the Court sought and received permission to meet separately with the attorneys and the parties in an effort to resolve, what was at the time, a thirty-six year old case.[19]

On June 28, 2001, the 1998 Superseding Consent Decree was itself superseded by the 2001 Superseding Consent Decree. R. 17. The 2001 Decree covered among other things, supervisory personnel, hiring, teacher assignment and student transfers. *Id.* With respect to the remaining issues, at the strong suggestion of the Court, the United States agreed to allow the School System to develop a plan for student assignment and facilities to remedy the System's continuing violations.

## VIII.

### THE SUPERSEDING CONSENT DECREE OF JUNE 28, 2001

#### A. The United States Motion Of May 11, 2001

The basis for the United States Department of Justice's motion, filed on May 11, 2001, was: (1) the United States investigation commenced in June 1992 of the Evangeline Parish School Board's continuing violations of its obligations under the United States Constitution and the previous orders of the Court; (2) a March 19–21, 2001 meeting between the attorneys for the government, the government's expert, the attorney for the School Board and certain school officials to discuss remedial actions that could be undertaken by the School Board to address discriminatory policies and practices identified by the government's investigation; (3) a tour of some of the System's schools to inspect the remedial actions reportedly taken by the School Board in response to the government's continuing concerns at those schools, i.e., the three predominantly African–American schools in Ville Platte; (4) the need to "take immediate action in abolishing the infestation of rodents, snakes, and skunks," at James Stephens Elementary

School, one of the three predominantly African–American Schools in Ville Platte; (5) the agreement by the School Board to submit a modified plan within sixty days of the March 19–21 meeting addressing the problems outlined at the meeting including discriminatory student and faculty assignments, and inequities in facilities; (6) the May 9, 2001 response of the School Board, i.e. the modified plan that, in part, would move children from James Stephens Elementary to Ville Platte High School, effectively perpetuating the one race status of both schools; (7) the failure of the School Board to address the issue of faculty assignment by race, except through voluntary transfer, enhanced recruitment to balance faculty and to strongly encourage principals to hire teachers in a manner to balance their faculties; and (8) the government's conclusion that further "negotiations between the parties will not be fruitful." It was also the view of the United States, as expressed in its motion, that given the many simple alternatives to remedy the problems outlined at the March 19–21, 2001 meeting and considering the history of the Evangeline Parish School System, the suggestions in the plan submitted by the School Board "appear to be designed to maintain an illegal and unacceptable status quo," and "demonstrates [sic] a lack of appreciation of the severity of the situation in the Evangeline Parish School System."

#### B. The Status Conference of May 30, 2001

The requested status conference with the attorneys for the parties was conducted on May 30, 2001. Because of the seriousness of the allegations made by the United States and the ancient history of the case, the Court required all members of the Evangeline Parish School Board, the acting Superintendent of Schools, the central office staff, and all fourteen of the school systems principals to attend the conference. As previously described, it was at the May 30 status conference the Court learned that no more than five of those present had actually seen, much less read the Superseding Consent Decree of October 14, 1998 under which the Evangeline Parish School Board and School System was

---

19. *See,* Code of Conduct for United States    Judges, Canon 3A(4).

ostensibly operating. As also previously described, it was after this status conference that the Court sought and received the permission of the parties to meet with individual attorneys and parties in an attempt to resolve the outstanding issues between the United States and the School Board and to avert the necessity of the government dropping the nuclear bomb and placing the twin issues of student assignments and facilities on the Court's lap for resolution.

C. *The Court's Actions Subsequent To The May 30, 2001 Status Conference And Prior To The Signing Of The Superseding Consent Decree*

After the May 30 status conference, the Judge met individually with each member of the School Board. The discussion with the Board members went something like this: (1) the Federal Judge was from Bunkie, not from Mars; (2) the Federal Judge did not enjoy sitting in Lafayette and throwing lightning bolts at the Evangeline Parish School System just because he could; (3) each member of the School Board took in essence the same Oath of Office when he or she was elected to his or her four-year position as did the Federal Judge when he was appointed to his life time job, i.e., to support the Constitution and laws of the United States; (4) the Federal Judge was not sure how the individual school board member felt about his or her Oath of Office, but the Federal Judge was dead serious about discharging the duties under his Oath of Office; (5) the Federal Judge wanted to do all that was humanly possible, consistent with his Oath of Office, not to have to impose a Court-ordered closure of schools and/or a Court-ordered transfer of students as had happened in the Federal Judge's home parish, neighboring Avoyelles in 1988, *See* FN 28; (6) the Evangeline Parish School Board had in Robert L. Hammonds, in the Federal Judge's view, the finest school desegregation attorney in the State of Louisiana and that if the members of the School Board followed the advice of their attorney, they would likely never run afoul of the United States Department of Justice or the Court; (7) as long as the Court was convinced that the School Board was acting in "good faith," to use the

football metaphor, the Federal Judge, consistent with his Oath of Office, would act as a pulling guard and run interference for the School Board against the Justice Department or anyone else; and lastly, (8) the Federal Judge committed to each member, that this desegregation case and the St. Landry Parish School Desegregation case were the two most important cases on the Court's docket and that the Federal Judge would work his heart out to assist the Evangeline Parish School Board, in meeting the Evangeline Parish School System's constitutional obligations in this case so that the System could be returned to the Evangeline Parish School Board as soon as possible.

At its bi-monthly meeting on June 12, 2001, the Evangeline Parish School Board voted unanimously, with two members absent, to authorize the adoption of the Superseding Consent Decree.

On June 28, 2001, the Court approved the Superseding Consent Decree that was submitted jointly by the parties, thus making it an order of this Court.

D. *The Provisions Of The Superseding Consent Decree*

It is not the intent of this section to fully inform the reader of each of the provisions of the Superseding Consent Decree of June 28, 2001 under which the School Board and the School System are currently operating. Rather, it is the intent of the writer to: (1) illustrate the long-standing violations of the orders of this Court and of the Constitution of the United States that the provisions of the Decree were intended to *finally* remedy, *See* Section V, *The History of the Evangeline Parish Desegregation Case Based On The Court Record*, subsections A, C, E and F; Section VII, *September 17, 1996—May 10, 2001*; and, Section VIII, subsection A, *The United States Motion of May 11, 2001*; and, (2) to identify those provisions of the Decree that the Court insisted on being included to afford the School Board the opportunity to demonstrate its "good faith" in remedying the long-standing violations, or alternatively, to give the School Board enough rope to hang itself. And, in the event of the latter, for the United States Department of Justice

to do what it deemed appropriate to place its plan to remedy those violations before this Court.

1. *Long-standing violations sought to be remedied by the Superseding Consent Decree of June 28, 2001:*

(a) elimination of racially identifiable schools;

(b) assignment of principals, assistant principals, teachers and those who work directly with children in compliance with the standards set forth by the United States Court of Appeals for the Fifth Circuit in *Singleton v. Jackson Municipal Separate School District;*

(c) elimination of the selection and appointment of administrators, principals, assistant principals and teachers on the basis of race;

(d) prevent zone jumping and require students to attend the school in the zone in which they live;

(e) provide a procedure for the interdistrict and intra-district transfer of students;

(f) provide for Majority to Minority transfer; and

(g) continue the requirement of bi-annual *Hines[Hinds] County* reports by the School Board to evidence its compliance with the orders of this Court and the United States Constitution.

2. *Provisions required by the Court to be included in the Superseding Consent Decree of June 28, 2001:*

(a) that the obligations and commitments made in the Decree were those of the School Board and of its *individual members, current and future;*

(b) require the Superintendent to provide a copy of the Superseding Decree to all persons who may qualify to run for a position on the Evangeline Parish School Board within three days of the closing of the qualifying period of any regularly scheduled or special election called for election to the School Board, and to require the Superintendent to certify to the Court that he has complied with same within five days of the close of the qualifying period;

(c) in order to monitor compliance of the Decree and all previous orders of the Court and other outstanding issues, quarterly meetings be conducted by the Court with the President of the Evangeline Parish School Board, the Superintendent of Schools and counsel of record for the parties, with two of the meetings to occur within 30 days of the filing of the School Board's June 1 and October 15 *Hines[Hinds] County* Reports;

(d) as it relates to the selection of assistant superintendent, principal, assistant principal and any supervisory or administrative position on the central office staff, the Superintendent shall recommend a person to the Board from the top three ranked applicants; if the recommendation of the Superintendent was not approved by the School Board, then a written notice of the rejection be filed with the Court by the President of the School Board within five days of the rejection, stating the reasons for the School Board's rejection and the numerical vote for and opposed to the recommendation; in no event was the School Board to fill a vacancy contrary to the Superintendent's recommendation before the passage of ten days from the School Board President's filing the notice of the rejection with the Court;

(e) require the School Board to conduct an orientation to familiarize newly elected School Board members with the selection process for assistant superintendent, principal, assistant principal and any supervisory or administrative position on the central office staff;

(f) give the Superintendent the authority to assign and/or reassign the teaching staff of each school with his decision on such assignment or transfer being final;

(g) as it relates to the transfer of principals or assistant principals, the Superintendent shall make a recommendation to the Board; if the recommendation of the Superintendent is not approved by the School Board, a written notice of the rejection shall be filed with the Court by the School Board President within five days of the rejection, stating the School

Board's reasons for the rejection and the numerical vote for and opposed to the recommendation; in no event was the School Board to transfer a principal or assistant principal contrary to the recommendation of the Superintendent before the passage of ten days from the School Board President filing the notice of the rejection with the Court;

(h) the School Board, the Superintendent and *each school principal* have a continuing obligation to monitor student enrollment to ensure that no unlawful inter– or intra-district transfers were permitted and that all attendance zones are enforced; and,

(i) the School Board was required to provide a photostatic copy of a certified copy of the Superseding Consent Decree to each of the following categories of its employees within fifteen (15) days of the Decree's entry by the Court, the accomplishment of same to be certified to the Court by the President of the School Board within twenty (20) days of the Decree's entry by the Court: (1) Superintendent; (2) Assistant Superintendent; (3) central office supervisors; (4) Principals; and (5) Assistant Principals.

### E. *The Court's Rational In Requiring That Certain Provisions Be Included In The Superseding Consent Decree*

This Court knows much more about this thirty-nine year old plus school desegregation case today than it did on June 28, 2001 when the Decree was entered. Although having presided over the case since September 17, 1996 and having had considerable contact with the lawyers for the parties, this Judge, for the reasons set out previously, had not given the case the attention it not only deserved but also required.

It was, however, *painfully* apparent to the Court after the May 30, 2001 status conference that few of the employees of the School System and none of the members of the School Board understood their obligation and their responsibility to the United States Constitution in the operation of the Evangeline Parish School System. It was also apparent that many of the problems the School Board had encountered with the Justice Department in recent years had as much to do with "good ole boy" politics as it had to do with "race and prejudice." Couple the lack of knowledge and School Board politics with what Sheryll Cashin, Professor of Law, Georgetown University, refers to as "one of the consistent problems with race relations in the United States ... whites generally believe that blacks have reached parity with regard to racial inequality, whereas blacks still experience very real discrimination and inequality," [20] and the Court was on the horns of a dilemma. How to bridge the facts on the existing situation in the Evangeline Parish School System with the reality of the law, not only for the School Board, but also for the Judge, was the Court's conundrum.

"Someone" within the School System had to be *responsible* to the Court for the implementation by the Evangeline Parish School System of the Superseding Consent Decree and the previous orders of the Court. However, to charge that "someone" with such responsibility, he or she would also have to have the *authority* to comply with the Court's orders so that the School Board, thus the School System, could meet its constitutional obligations without the political pressure and political shenanigans that are routine in Evangeline Parish.

The "someone" who would have the *responsibility* and the *authority* under the provisions of the Superseding Consent Decree required by the Court would be the Superintendent of Schools for Evangeline Parish, Rayford J. Fontenot, who was appointed by the School Board the night before the Court's implementation of the Superseding Consent Decree.

### IX.

#### *MAY 31, 2001—MARCH 26, 2004*

A. *The School Board's August 15, 2001 Rejection of Marvelyn Harris to be Principal at Pine Prairie High School*

The ink was hardly dry on the June 28, 2001 Superseding Consent Decree when the

---

**20.** Cashin Sheryll, The Failures Of Integration 230 (Public Affairs 2004).

new Superintendent made his first recommendation to the School Board for a principalship on August 15, 2001. The vacancy had occurred at Pine Prairie High School with the retirement of the School's long-time principal.

Pursuant to Section C, paragraph 2, pages 6–7 of the Decree, Superintendent Fontenot recommended Ms. Marvelyn Harris, an African–American, and the assistant principal at Vidrine High School who at the time had over thirty years of experience in the Evangeline Parish School System. In making his recommendation, the Superintendent later relayed to the Court that, based on results of the three phase process that the four applicants for the Pine Prairie position had undergone, he had never seen as great a discrepancy between the number one score and the number two score. Ms. Harris had the number one score.

The School Board voted seven to two to reject the Superintendent's recommendation with two abstentions. Ms. Harris received only the votes of the two African–American members present. The third African–American member was absent from the meeting.

After receipt of the notice of the School Board President that the School Board had rejected the Superintendent's recommendation, the Court issued a minute entry on September 6, 2001. R. 28. A better understanding of the Court's perception of the School Board Members' understanding of their individual obligations in this case, including those under the recently enacted Decree of June 28, can be gleaned from the Court's September 6 minute entry, R.28, which reads in pertinent part:

From a review of the individual School Board members' letters and the discussion concerning the issue that was had at the August 29, 2001 meeting [with the President of the Evangeline Parish School Board, other members of the School Board, the Superintendent of the Evangeline Parish Schools and the attorneys of record for the parties] the Court assumes the following:

1. This was the first appointment of supervising personnel made pursuant to the Affirmative Action Policy provided for in the Superseding Consent Decree entered by the Court on June 28, 2001.

2. This was the first recommendation of supervisory personnel made by Superintendent Fontenot since he became Superintendent of Evangeline Parish Schools on June 27, 2001. The applicants were required to compete for the position in accordance with the Affirmative Action Policy provided for in the Superseding Consent Decree of June 28, 2001.

3. According to the criteria of the Affirmative Action Policy of the Superseding Consent Decree of June 28, 2001 three of the four applicants who applied for the position of principal at Pine Prairie High School were eligible for consideration by Superintendent Fontenot.

4. Prior to the Evangeline Parish School Board's August 15, 2001 meeting when his recommendation to fill the vacancy at Pine Prairie High School was made, Superintendent Fontenot did not tell any member of the Evangeline Parish School Board who he intended to recommend for the position or his reasons therefor.

5. Superintendent Fontenot made his recommendation to fill the vacancy at Pine Prairie High School in open session at the August 15, 2001 meeting of the Evangeline Parish School Board. Before the Board voted on and rejected his recommendation, the School Board did not adjourn to Executive Session pursuant to La. R.S. 42:4.1, *et seq.*, to discuss the recommendation of the Superintendent, the reasons therefor, or the relative *merits* and/or *demerits* of the three individuals from whom he had to select.

6. The person who Superintendent Fontenot recommended to be principal at Pine Prairie High School is African–American.

7. The vote on Superintendent Fontenot's recommendation to fill the position of the principal at Pine Prairie High School was seven against, two for and

two abstentions, with two members absent;

8. After the Superintendent's recommendation was rejected, some of the members of the Evangeline Parish School Board and members of the audience who were in attendance were confused as to the procedural posture that the Board found itself in because of the rejection of the Superintendent's recommendation under the June 28, 2001 Superseding Consent Decree.

9. As of the Court's August 29, 2001 meeting with the President of the Evangeline Parish School Board and the Superintendent of Evangeline Parish Schools, only three members of the Evangeline Parish School Board had inquired as to Superintendent Fontenot's reasons for the recommendation that he made to fill the principal position at Pine Prairie High School.

10. The Court has had the opportunity to discuss with Superintendent Fontenot, in detail, the reasons for the recommendation that he made, the relative *merits* and/or *demerits* of the three candidates from whom he had to choose and the particular needs of the school at Pine Prairie in light of the extensive construction that is ongoing at the school and the problems that are occasioned thereby....

R. 28.

The Court ordered that a hearing on the Superintendent's recommendation to fill the vacancy at Pine Prairie High School be conducted on the 20th day of September, 2001 at 8:30 a.m.

In connection with the scheduled September 20 hearing, the Court's minute entry further stated:

The Court's assumptions set out herein above are based on the letters received from the individual School Board members, discussions conducted with the individuals who attended the August 29, 2001 meeting and meetings with Superintendent Fontenot. Based on the further assumption that the information provided to the Court is accurate, the Court *requests* that the members of the Evangeline Parish School Board, at its next regularly scheduled meeting or any special meeting prior thereto and called for the purposes thereof, avail themselves of the provisions of La. R.S. 42:41 et seq., and adjourn to executive session to discuss 1) the personal issues raised by the Superintendent in his recommendation to fill the vacancy at Pine Prairie High School, 2) his reasons for the recommendation, and 3) the relative *merits* and/or *demerits* of the candidates from whom he had available to select.

In the event the members of the Evangeline Parish School Board comply with the Court's request and conduct such a meeting with Superintendent Fontenot, and after learning of and considering the reasons for his recommendation to fill the vacancy at Pine Prairie High School, the Evangeline Parish School Board, by a majority vote, reconsiders its previous decision and votes to follow the Superintendent's recommendation, the September 20, 2001 hearing will be canceled.

*Id.*

On September 19, 2001, the night before the scheduled hearing, the School Board reconsidered its August 15 vote to reject the Superintendent's recommendation and voted to appoint Ms. Harris principal of Pine Prairie High School. The vote was six in favor, with the three African–American members voting "yes," to two against, with three abstentions.

The Superseding Consent Decree signed less than two months earlier had passed its first test, but more importantly so had a plurality of the members of the Evangeline Parish School Board.

Ms. Harris, by all accounts to which the Court gives any credence, has been an excellent principal and has done a commendable job for the last three years at Pine Prairie.

### B.

*The Quarterly Meetings With the President of the School Board, the Superintendent of Schools, the Attorneys for the Parties and the President of the Evangeline Parish Chapter of the NAACP*

As the record of this case clearly demonstrates, at the time of the adoption of the

Superseding Consent Decree on June 28, 2001, continuing violations related to facilities and student assignment existed in the Evangeline Parish School System. In order to monitor compliance by the School System with the Decree and to afford the School Board the opportunity to remedy, as expeditiously as possible, the continuing violations related to facilities and student assignment, the Court insisted on the inclusion of Section A in the Decree. Section A required the quarterly meetings of the President of the School Board, the Superintendent of Schools and the attorneys for the parties.

As expressed in its meetings with the thirteen members of the School Board, it was the Court's view, that it was very much in the School System's interest for the School Board to adopt a consolidation plan that resolved the continuing student assignment and facilities issues, despite the "political heat" that might be occasioned thereby. Such an approach would allow the School Board to adopt a plan, as long as it was otherwise constitutional, that was: (1) educationally sound; and, (2) to the extent possible, respected the cultural integrity of the small towns and villages that comprise Evangeline Parish. The Court cautioned the School Board members that it was also its view, that not only was it in the Evangeline Parish School System's interest, but in their individual interests to avoid what had happened in the Judge's home parish, neighboring Avoyelles in 1988. Due to the unwillingness or inability of the Avoyelles Parish School Board to present a constitutional plan to the United States District Court, the presiding judge ordered that the number of schools in the Parish be reduced from nineteen to twelve and the number of high schools reduced from eleven to three, five weeks before the opening of the 1988–89 school year. *See* FN 27. It was also the Judge's view that a plan adopted by the School Board would, after the initial turmoil and adjustment that would accompany its implementation, be much more readily accepted by the citizens of Evangeline Parish than *any* plan submitted by the Department of Justice or fashioned by the Judge. It was the Court's intent by requiring the quarterly meetings that the Court be kept current on the United States and the original plaintiffs continuing concerns about the implementation of the Plan and the elimination of *de jure* segregation and the vestiges of that segregation, as well as the School Board's perspective and problems that were likely to arise as those concerns were sought to be addressed.

The record reflects that the Court met with the President of the Evangeline Parish School Board, the Superintendent of the Evangeline Parish Schools, the School Board attorney, the attorney for the original plaintiffs on at least a dozen occasions prior to January 2004: 1) July 18, 2001, *R. 21;* 2) August 31, 2001, *R.27;* 3) November 5, 2001, *R. 34;* 4) January 11, 2002, *R. 37;* 5) March 19, 2002, *R. 39;* 6) July 9, 2002, *R. 49;* 7) October 17, 2002, *R. 57;* 8) December 19, 2002, *R. 59;* 9) March 26, 2003, *R. 64;* 10) June 23, 2003, *R. 69;* 11) September 24, 2003, *R. 75;* 12) December 16, 2003, *R. 97.* In addition to those required to attend, on occasion some School Board members attended. The record reflects that Mr. Eddie Gaudy, President of the Evangeline Parish Chapter of the NAACP, attended all meetings from August 31, 2001 through December 16, 2003.

Based on the discussions had during the quarterly meetings, the Court in December 2002, instructed the Superintendent to form a committee of educators of his choosing, assisted by the School Board attorney, to develop a student assignment plan for consideration by the School Board. The Court's only instruction to the Superintendent as to the makeup of that committee was to make sure it had adequate African–American representation.

C.  *The National Association For Neighborhood School ("NANS") and The Evangeline Chapter of NANS*

On March 23, 2003, the Evangeline Parish chapter of an organization known as the National Association for Neighborhood Schools ("NANS") was founded. James Kirt Guillory, as president, along with the other founders, began to recruit members for the Evangeline Parish NANS chapter identifying the organization's mission to end racial school assignment and restore the neighborhood school concept. 03/15/04 Hearing, Tes-

timony of James Kirt Guillory, pp.172, 1.16,—174, 1.7.

D. *The Superintendent's Committee's Plan for the Reorganization of the Evangeline Parish Schools and the School Board's Response Thereto*

At approximately the same time Applicant Intervenors filed their Motion to Intervene on September 18, 2003, the Superintendent's Committee completed its draft plan for the consolidation and reorganization of the Evangeline Parish Schools. The Superintendent's Committee and the School Board attorney thereafter negotiated the plan they had developed with the Department of Justice. During this negotiation period, Applicants for Intervention, though not parties to the suit, served the School System with several public information requests pursuant to Louisiana Revised Statute 44:1, *et seq.*, seeking information about the specifics of the plan that was being developed by the Superintendent's Committee. Based on the prior instruction of the Court when the Superintendent's Committee was formed, the Superintendent declined to provide any information about the plan being developed until it was submitted to the School Board.

On January 6, 2004, the Department of Justice informed the School Board attorney that based on careful review of the proposed Plan, if that Plan was adopted by the School Board, the Department of Justice would have no objection to it or to its implementation. On January 7, 2004, the Superintendent's Committee presented the Plan to the School Board. The Plan as submitted called for the Evangeline Parish School Board to, among other things: close high schools at Bayou Chicot, Chataignier and Vidrine; close elementary/middle schools in Chataignier (Carver), Bayou Chicot (Hester Heath), Pine Prairie and Ville Platte (James Stephens); reorganize the remaining schools to conform to either a K–4/5–12 or K–8/9–12 grade structure; maintain a Majority to Minority program; create a medical science academy; create a performing arts academy; establish a Pre–GED program; and, modify zone lines

in a manner that furthered desegregation, including but not limited to, assigning an island zone of Ville Platte students to Pine Prairie High School for grades Pre–K through four and nine through twelve and to Bayou Chicot for grades five through eight and assigning students in the Dr. Martin Luther King Drive/State Avenue of Ville Platte area to Vidrine schools. The Plan also called for the appointment of a desegregation compliance officer by the School Board.

Once informed of the Department of Justice's position, and after presentation of the Plan by the School Board attorney and the Superintendent and his Committee, the School Board announced a series of six public meetings to present the Plan to the community and provide an opportunity for public comment. The six meetings were conducted at: 1) Ville Platte, January 15, 2004; 2) Chataignier, January 20, 2004; 3) Mamou, January 22, 2004; 4) Vidrine, January 26, 2004; 5) Pine Prairie, January 27, 2004; and 6) Bayou Chicot, January 28, 2004. Representatives of Applicants for Intervention were present at each of the six meetings to express their disagreement with the proposed Plan. The six meetings could, at a minimum, be described as contentious and lengthy.

On February 18, 2004, the Evangeline Parish School Board voted seven to six to reject the Plan. However, the Board held a second vote on March 1, 2004, and voted to accept the Plan by a vote of eight to five with District 2 Ward 2 member Dr. Bobby Wakefield Deshotel and District 6 Ward 3 member John David Landreneau changing their previous "no" votes to "yes" votes. On March 2, the Court ordered any party [21] seeking to object to the Plan to do so by March 18, 2004 and set a hearing on the Plan for March 25, 2004 in order for the Superintendent, in the event the Plan was approved by the Court, to take appropriate action for the Plan's implementation for the opening of the 2004–2005 school year on August 13, 2004. R. 108.

---

**21.** Although not a party, the Court allowed Applicants for Intervention to submit objections to the Plan in the event they were allowed to intervene

after the hearing that was scheduled to be conducted during the week of March 15, 2004.

E. *The Hearing on Applicants For Intervention's Motion to Intervene and the Court's Order Denying the Motion*

The hearing on Applicants for Intervention's Motion for Intervention which had been set for hearing during the week of March 15, 2004 by minute entry dated December 19, 2003, R. 96, was conducted on March 15 and 16, 2004.[22] R. 124. Based on the Findings of Fact and Conclusions of Law specifically set out hereinafter, the Court issued an oral ruling, at the conclusion of testimony and argument by the attorneys, that Applicants for Intervention were not entitled to intervene, either as of right or permissively.

On March 18, 2004, Applicant Intervenors filed a Motion For Stay Or Injunction Pending Appeal And/Or Supervisory Writs. R. 128. That same day, the Court conducted a hearing on the Motion to Stay which was denied for oral reasons assigned after argument by the attorneys for the parties. R. 129. On March 26, 2004, the Court issued its written Order Denying Motion To Intervene which provided in pertinent part:

After hearing the testimony and reviewing the documents admitted into evidence, the Applicants for Intervention clearly not meeting the requirements of Rule 24(a) or 24(b) of the Federal Rules of Civil Procedure under long standing and well established jurisprudence, in part for oral reasons assigned on March 16, 2004, and in particular for the written reasons that will follow....

R. 136.

## X.

### THE MOTION TO INTERVENE

#### A. Background

The Motion to Intervene, R. 71, was filed on September 18, 2003 by the Evangeline Parish Chapter of an organization known as the National Association of Neighborhood Schools ("NANS") that was formed on March 23, 2003 by ten Caucasian citizens of Evangeline Parish. According to its website, the National Association of Neighborhood Schools' mission, to terminate all Federal school desegregation cases, is based on the following belief:

The practice, often ordered by Federal Courts under the guise of "desegregation," results in the disenfranchisement of the public and misuse of taxpayer education funds.... Through their control of school districts federal judges have ordered levies imposed, told elected officials how they must vote and have even stripped authority from duly elected officials. Does this sound like something that should happen in America? It all starts when a court orders a school district to "desegregate" its schools and issues a "remedial" order. But the "remedial" orders do not remedy. They are destructive.

*See* www.NANS.org/about.shtml.

The Evangeline Parish Chapter of NANS' stated purpose is:

[A]s a united effort by Evangeline Parish parents and guardians of students of all races and nationalities to preserve where ever legally possible the right of parents to send their children to, and all of the students to attend, the public school closest to their homes as opposed to being mandatorily assigned to particular schools on the basis of racial, ethnic or socioeconomic factors and fourteen Caucasian and African–American individuals. R. 103, Applicants for Interventions' Pre-trial Order.

On September 29, 2003, Applicants for Intervention filed a Motion For Expedited Hearing. R. 78. By Order dated October 6, 2003, the Court denied the Motion for Expedited Hearing stating that the matter would be "taken up in due course based on the Court's schedule. If after reviewing filings made in response to the motion, the Court deems a hearing to be necessary or appropri-

---

**22.** In their pleadings, Applicant Intervenors persisted in addressing whether or not the School System was unitary, an issue which exceeded the scope of and was wholly irrelevant to the issue of intervention. For further discussion of the Applicant Intervenors interest in unitary status, see section on permissive intervention.

ate, a hearing will be scheduled." R. 79. An opposition to the Motion To Intervene was filed by the original plaintiffs on October 8, 2003, R. 80, and by the United States on November 7, 2003. R. 87. On November 10, 2003, the Evangeline Parish School Board filed a response stating that while "its members have adequately represented their constituents (including the Applicants) to the best of their abilities and will continue to do so . . . defendant School Board also feels that it should take no action which could be construed as an effort on its part to discourage the citizens of Evangeline Parish from participating in the discussions relative to this important case." R. 88. Thereafter, on November 20 and 24, Applicants for Intervention filed replies to the oppositions of the original plaintiffs and of the United States. R. 90 & 92. On December 17, 2003, an on-the-record telephone conference with the attorneys for the parties was conducted, and a hearing on the motion to intervene was set for the week of March 15, 2004. Based on the December 17 telephone conference, a Pre–Hearing Procedure Outline was issued on December 19, 2003, setting specific deadlines for discovery and the filing of motions among other things. R. 98.

On March 15 and March 16, 2004, the Court conducted a hearing on the Motion to Intervene, and at the conclusion of testimony on March 16, the Court orally denied the Motion to Intervene and stated that it would issue written reasons for the denial. Also, on March 16, the Court denied as moot Applicant Intervenors' Motion to Extend Time For Filing Objections To School Reorganization Plan filed on that same date. R. 110. R. 127. On March 18, 2004, Applicants for Intervention filed a Motion to Stay or Injunction Pending Appeal and/or Supervisory Writs, R. 128, which was heard and denied by the Court on that same date. R. 129. On March 26, 2004, the Court issued a written judgment denying mover's Motion for Intervention concluding that:

> This matter came on for hearing on the 15th and 16th day of March, 2004 on a Motion To Intervene [Rec. Doc. 78] filed by the Evangeline Parish Chapter of an organization known as the National Association of Neighborhood Schools ('NANS')

that was formed in March, 2003 with its stated purpose, 'as a united effort by Evangeline Parish parents and guardians of students of all races and nationalities to preserve wherever legally possible the right of parents to sent [sic] their children to, and all of the students to attend, the public school closest to their homes a[sic] opposed to being mandatorily assigned to particular schools on the basis of racial, ethnic or socioeconomic factors and fourteen Caucasian and African–American individuals.['] After hearing the testimony and reviewing the documents admitted into evidence, the Applicants for Intervention clearly not meeting the requirements of Rule 24(a) or 24(b) of the Federal Rules of Civil Procedure under long standing and well established jurisprudence, in part for oral reasons assigned on March 16, 2004, and in particular for the written reasons that will follow,

> IT IS ORDERED that the Motion To Intervene filed by the Evangeline Parish Chapter of the National Association of Neighborhood Schools [Rec. Doc. 78] is hereby DENIED. R. 136.

The following Findings of Fact and Conclusions of Law follow the Court's March 26, 2004 order.

### B. Findings of Fact and Conclusions of Law

Rule 24 of the Federal Rules of Civil Procedure provides for two types of intervention: (1) intervention as of right under rule 24(a); and (2) permissive intervention under Rule 24(b). See Fed.R.Civ.P. 24(a) & (b). Because Applicants for Intervention seek relief under both types of intervention, the Court will address the application of each in turn.

### 1. FRCP 24(a)—Intervention as of Right

Rule 24(a) governs intervention as of right and is divided into two sections: Rule 24(a)(1) and 24(a)(2). Rule 24(a)(1) provides that "[u]pon timely application anyone shall be permitted to intervene in an action when a statute of the United States confers an unconditional right to intervene." Fed.R.Civ.P. 24(a)(1). As Applicants for Intervention have not alleged a right to intervene pursu-

ant to section (a)(1), it is not necessary to address their application for intervention under Rule 24(a)(1).[23]

In order to intervene as of right under Rule 24(a)(2), the Applicants for Intervention must satisfy a four-prong test:

(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit. Fed. R.Civ.P. 24(a)(2); *See also, Ford v. City of Huntsville*, 242 F.3d 235, 239 (5th Cir. 2001) (citing *Taylor Communications Group, Inc. v. Southwestern Bell Tel. Co.*, 172 F.3d 385, 387 (5th Cir.1999)).

Applicants for Intervention must meet all four conditions and bear the burden of demonstrating their entitlement to intervene. *See United States v. Texas Eastern Transmission Corp.*, 923 F.2d 410, 414 (5th Cir. 1991). The failure of Applicants for Intervention to fulfill any one of these prerequisites forecloses their ability to intervene as of right under Rule 24(a)(2). *See Bush v. Viterna*, 740 F.2d 350, 354 (5th Cir.1984).

In their motion, Applicants for Intervention assert that their interests include "preserving the right of parents to enroll their children in, and of all students to attend, the public school nearest their home and to preserve the identity and traditions of their local communities, neighborhoods, towns and villages—the heart of each of which is the public school." Motion to Intervene, ¶ 6. Applicants also assert that the Evangeline Parish School System is unitary, and therefore, any student body desegregation plan violates their constitutional rights by assigning students to a school based on their race. *Id.* at ¶¶ 17, 18. In its opposition to Applicants' Motion for Intervention, the United States asserts that Applicants have no legally

cognizable interest in this desegregation lawsuit and that any interests of Applicants are already represented by the existing parties.

*a. Whether Applicants for Intervention Have A Legally Cognizable Interest In The Subject Matter Of The Underlying Action*

■ The second condition for intervention as of right requires Applicants for Intervention to demonstrate a legally cognizable interest in the subject matter of the underlying transaction, the desegregation of the Evangeline Parish School System. In considering the second condition for intervention as of right, the Fifth Circuit in *United States v. Perry County Board of Education*, 567 F.2d 277 (5th Cir.1978), held that "parents seeking to intervene must demonstrate an interest in a desegregated school system" and must articulate a "direct, substantial, legally protectable interest in the proceedings." *Id.* at 279. A motion for intervention must therefore "bring to the attention of the district court the precise issues which the [Applicants for Intervention] sought to represent and the ways in which the goal of a unitary system had allegedly been frustrated." *Hines v. Rapides Parish Sch. Board*, 479 F.2d 762, 765 (5th Cir.1973); *Perry County*, 567 F.2d at 279–280 (Applicants for Intervention fail to meet *Hines* when "nothing in their brief or in their petition for intervention... indicates that they are challenging the [issue in question] on the ground that it impedes the establishment of a unitary system.")

■ An interest in maintaining local community schools, without any showing that consolidation would hamper the avowed goal of eliminating the vestiges of past discrimination, fails to constitute a legally cognizable interest in a school desegregation case. *See Perry County*, 567 F.2d at 279 ("In the context of public school desegregation, there are innumerable instances in which children, parents, and teachers may be deprived of various 'rights' (e.g. the 'right' to attend a neighborhood school without having had the

**23.** Even assuming *arguendo* that Applicants for Intervention had alleged a right to intervene under Rule 24(a)(1), they have not identified a statute of the United States that confers upon them an unconditional right to intervene, and therefore, fail to meet the requirements of 24(a)(1).

opportunity to participate directly in the judicial proceedings which divest them of those 'rights')"); *Valley v. Rapides Parish Sch. Bd.*, 646 F.2d 925, 942 (5th Cir.1981)("While it has long been held that parents have a right to direct the education of their children, such a right does not give them unqualified authority to choose a particular public school.") (citations omitted).

Applicants for Intervention have failed to demonstrate an interest in the desegregation of the Evangeline Parish School System. A review of their motion reveals that Applicants failed to even mention the term "desegregation." Instead, Applicants based this action on their opposition to the student reassignment and consolidation action taken in pursuit of desegregation in Evangeline Parish. In their motion, Applicants stated that their interests in intervening in this action are to "preserve the rights of parents to enroll their children in, and of all students to attend, the public school nearest their homes and to preserve the identity and traditions of their local communities, neighborhoods, towns and villages-the heart of each of which is the public school." Motion to Intervene, ¶ 6. During the March 15 and 16, 2004 hearing on the motion, the testimony of several individual Applicants confirmed that their primary interest in intervening in this lawsuit was to insure their children have the right to "go to school based on their geographic location, where they live and to the nearest school.... The purpose of desegregation ... is so that people can go to whatever school in the neighborhood that they live in." Testimony of Gail McDavid, p. 278, ll. 7–10; p. 279, ll. 10–12; *See also*, Testimony of Randy McCaulley, p. 256, ll. 3–5. While Applicants expressed concern over being denied the right to send their children to a particular school, none could identify a specific concern with the Plan which would frustrate the goal of desegregation. Rather, Applicants consistently testified that they believed the School System to be unitary, although they had no understanding of the actual *Green* factors required for unitary status and were unfamiliar with any specifics of the Plan as it related to bringing the school system into unitary status. Testimony of Randy McCaully, p. 235, ll. 18–24; pp. 243–45, ll.12–25; pp. 252–53, ll. 9–11; Testimony of Gail McDavid, pp. 277–80, ll. 14–21; pp. 285–87, ll. 18–5; Testimony of Kirt Guillory, pp. 215–16, ll. 5–13; p.219–20, ll. 14–9; Testimony of Dr. Gregory Ardoin, pp. 438–39, ll. 14–18; Testimony of Kent Guillory, p. 454, ll. 2–8; pp. 460–61, ll. 20–4. As Applicants have failed to demonstrate a legally protectable interest in the instant proceedings, they have failed to meet the second condition for intervention as of right. Even assuming *arguendo*, for purposes of completeness of the record only, that Applicants had established an interest in a desegregated school system, i.e. the second prong of the four prong test under Rule 24(a)(2), Applicants for Intervention cannot establish the fourth requirement for intervention as of right, that the existing parties cannot adequately represent their interests.

*b.  Whether The Intervention Applicants' Interest Is Inadequately Represented By The Existing Parties To The Suit*

The fourth condition for intervention as a matter of right requires Applicants for Intervention to demonstrate that their interest must be inadequately represented by the existing parties to the suit. In a school desegregation case, intervention as of right is not appropriate if the Applicants present issues that existing parties are aware of and stand competent to represent. See *United States v. Franklin Parish Sch. Bd.*, 47 F.3d 755, 757 (5th Cir.1995) (citing *Hines v. Rapides Parish Sch. Bd.*, 479 F.2d 762, 765 (5th Cir.1973)). Applicants contend that the parties to this lawsuit do not adequately represent their interests because "neither the defendant school board nor the plaintiff intervenor [the United States] are as affected by the mandatory assignment of students on the basis of race as are applicants." Applicants for Intervention Prehearing Outline, p.18. Applicants further contend that their interests "are rather personal to them and are clearly different from those of the defendant school board (and the United States for that matter)..." Applicants for Intervention Supplement to Prehearing Outline, p. 16. Applicants state that "[o]nly one of the school board members has children in the Evangeline Parish

School System" and that the "parties appear to be totally unconcerned" and have "suppressed the rights" of the Applicants for Intervention. *Id.* Applicants also contend that they have not been adequately represented because "there has been no consideration or determination as to the unitary status of the school system" prior to the development of the student body desegregation Plan. *Id.* at p. 22 & 23.

The record clearly reveals that the ultimate goal of the United States and the School Board is the same as the interest asserted by Applicants for Intervention, that of bringing the Evangeline Parish School System into unitary status. United States Exhibits 1–15, March 15, 2004 Hearing. The record further reveals that since March 11, 2001 and at other times previous thereto, the United States has vigorously represented the interests of the original plaintiffs. From September 1970, one year after the United States intervened in this action, to March 2004, just prior to the hearing on the instant motion, this Court has issued orders aimed at eliminating the vestiges of past discrimination and desegregation of the School System. Those orders were filed in response to investigations made by the United States after receiving complaints against the School Board. Investigations by the United States resulted in the Court issuing the following orders: a September 18, 1970 order requiring the School Board to adopt and publish non-racial objective criteria to be used in making personnel decisions; a July 28, 1972 order enjoining the School Board from providing a dual transportation system; a May 6, 1987 order enjoining the School District from allowing students to attend schools outside of their zone; a January 4, 1995 order requiring the School Board to meet its *Singleton* obligations; a Consent Decree approved by the Court on August 1, 1997 addressing the hiring, assignment, employment, student assignment, intra and inter-district transfer, and programmatic assignment practices and policies of the School Board; an October 21, 1998 Superseding Consent Decree which amended and clarified the August 1, 1997 Consent Decree; and, the Superseding Consent Decree issued by the Court on June 28, 2001, under which the Evangeline

Parish School System is currently operating. In attaining that goal, the Evangeline Parish School Board and the United States have entered into several joint agreements. The most recent of those agreements, the Superseding Consent Decree approved by the Court on June 28, 2001, specifically provides for the "Desegregation of Faculty and Other Staff" through the "Modification And Clarification Of Selection Procedures For Administrators And Supervisory Personnel" and the "Reassignment Of Faculty," as well as the operation of the Evangeline Parish School District "in a non-discriminatory manner" by incorporating a "Student Transfer Policy." June 28, 2001 Superseding Consent Decree.

While the presumption of adequate representation may be rebutted on a "relatively minimal showing," the Applicants for Intervention "must produce something more than speculation as to the purported inadequacy." *League of United Latin Am. Citizens v. Clements,* 884 F.2d 185, 189 (5th Cir.1989) (citing *Moosehead Sanitary Dist. v. S.G. Phillips Corp.,* 610 F.2d 49, 54 (1st Cir. 1979)). Applicants have provided nothing more than conclusory allegations that the School Board and the United States do not adequately represent their interests. Moreover, Applicants are not entitled to intervene based merely on the belief that their representatives on the School Board are not aggressively defending the instant lawsuit. *Franklin,* 47 F.3d at 757. There is a presumption that government institutions represent the interests of the public at large, particularly where the United States is plaintiff in a school desegregation case. *See United States v. Louisiana,* 90 F.R.D. 358, 363–64 (E.D.La.1981). "[W]hen the government is a party, the moving party must make a very compelling showing of inadequacy of representation." *Jones v. Caddo Parish School Bd.,* 704 F.2d 206, 221 n. 25 (5th Cir.1983).

Based on this similarity of interests, Applicants must demonstrate adversity of interest, collusion or nonfeasance on the part of the United States and/or the School Board in order to intervene under Rule 24(a)(2). *Franklin Parish,* 47 F.3d at 757. ("When the party seeking intervention has the same ultimate objective as a party to the suit, the

existing party is presumed to adequately represent the party seeking to intervene, unless the applicant-intervenor demonstrates adversity of interest, collusion, or nonfeasance."); *International Tank Terminals, Ltd. v. M/V Acadia Forest*, 579 F.2d 964, 967 (5th Cir. 1978). While Applicants do not specifically allege "adversity of interest, collusion or nonfeasance" in their request to intervene, the Court again, for completeness of the record only, will nonetheless address this issue.

### i. Adversity of Interest, Collusion, or Nonfeasance

In their motion to intervene, Applicants for Intervention contend that they have been "completely shut out of the democratic process in this matter to the extent that their rights as citizens, taxpayers, voters, students and parents have been suspended by virtue of an alleged 'gag order' prohibiting the elected public school board members, the duly appointed superintendent of schools and all the members of his staff from disclosing the specific facts or plans regarding the proposed consolidation to any of the Applicants for Intervention or to any other citizen or duly elected school board member." Motion to Intervene, ¶ 12. In their prehearing outline, Applicants allege that because the United States and the Court reviewed and approved the proposed draft of the Reorganization Plan prior to providing it to the School Board for public hearings, they had already decided "what such a plan will (or should) be." Pre-hearing Outline, p. 25. They further allege that "the perceived intimidation factor of the judge" prevented the school board members from taking "action concerning the school system that may be contrary to the thoughts, opinions and expectations of the judge." *Id.* at pp. 25–26.

Applicant's allegations concern the student assignment and facility consolidation Plan which the Superintendent's Committee completed and presented to the School Board for its consideration on January 7, 2004. The record of this case indicates that following the implementation of the June 28, 2001 Superseding Consent Decree, outstanding desegregation violations related to student assignment remained unaddressed. In order to begin remedying this violation as expedi-ently as possible, and to ensure that the Court understood the government's concerns, the original plaintiffs' concerns, as well as the School Board's perspective and problems that were likely to arise in addressing those concerns, the Court insisted on Section A being inserted into the Consent Decree of June 28, 2001. Section A provides as follows:

The Court shall meet with the duly elected president of the Evangeline Parish School Board and the duly appointed Superintendent or acting superintendent as well as counsel of record for the parties hereto on dates to be set by the Court during the months of July 2001 and August 2001 to monitor compliance with this Superseding Consent Decree. Thereafter, in order to monitor compliance with this Superseding Consent Decree and all previous orders of the Court issued herein, the Court shall meet quarterly with the duly elected president of the Evangeline Parish School Board and duly appointed Superintendent or acting superintendent and the attorneys of record on dates to be set by the Court so that two (2) of the quarterly meetings are conducted within thirty (30) days of the filing of the School Board's June 1st and October 15th reports.

Pursuant to Section A, the Court met with the President of the Evangeline Parish School Board, the Superintendent of the Evangeline Parish Schools, the School Board attorney and the attorney for the original plaintiffs on at least a dozen occasions prior to January 2004: 1) July 18, 2001, *R. 21;* 2) August 31, 2001, *R.27;* 3) November 5, 2001, *R. 34;* 4) January 11, 2002, *R. 37;* 5) March 19, 2002, *R. 39;* 6) July 9, 2002, *R. 49;* 7) October 17, 2002, *R. 57;* 8) December 19, 2002, *R. 59;* 9) March 26, 2003, *R. 64;* 10) June 23, 2003, *R. 69;* 11) September 24, 2003, *R. 75;* 12) December 16, 2003, *R. 97.* Based on the discussions had during the quarterly meetings, the Court, in December 2002, instructed the Superintendent to form a committee of educators of his choosing, assisted by the School Board attorney, to develop a student assignment plan for consideration by the School Board. The Court further instructed the Superintendent to make sure that the

Committee had adequate African–American representation. The Caucasian members of the Committee that the Superintendent appointed were: Toni Hamlin, Personnel Administrator, thirty-one years in the School System; Janice Landreneau, Curriculum and Instruction Administrator, twenty-nine years in the School System; Tom Ardoin, Operations Deputy Administrator, thirty-four years in the School System; and, Ted P. Soileau, Maintenance, Purchasing and Technology Deputy Administrator, twenty-three and one-half years in the School System. The African–American members of the Committee appointed by the Superintendent were: Marvelyn Harris, Principal, Pine Prairie, thirty-five years in the School System; Darwan T. Lazard, Principal, Carver Elementary, eleven years in the School System; and, Sherral Tezano, Principal, Mamou Upper Elementary, twenty-four years in the School System.[24] In January 2003, the Court met in Lafayette with the members of the Evangeline Parish School Board, the Superintendent, the attorney for the School Board and the District Attorney of Evangeline Parish to advise those members of the School Board who had not attended or had not regularly attended the quarterly meetings with the Court[25] of the instruction that had been given to the Superintendent for the formation of a Committee to devise a plan to address the outstanding issues relative to assignment of student population and facilities.[26] The instructions that the Court had given to the Superintendent and to the School Board were announced at the regularly scheduled School Board meeting on February 19, 2003. The Superintendent's Committee completed its proposed plan in September 2003, and the Committee and the School Board attorney began negotiations over the terms of the proposed plan with the Department of Justice in the last quarter of 2003. On January 6, 2004, the United States informed the School Board attorney that based on a careful review of the negotiated Plan, it had no objections to the Plan and its implementation. On January 7, 2004, the Superintendent's Committee presented the Plan to the School Board. Immediately thereafter, the School Board announced a schedule for six public meetings in order to present the Plan to citizens of Evangeline Parish and to provide an opportunity for public comment. The six meetings were conducted in Ville Platte on January 15, 2004; Chataignier on January 20, 2004; Mamou on January 22, 2004; Vidrine on January 26, 2004; Pine Prairie on January 27, 2004; and Bayou Chicot on January 28, 2004. Based on the comments made at the public hearings, modifications to the Plan were requested by the School Board and accepted by the United States. On February 18, 2004, the Evangeline Parish School Board voted seven to six to reject the modified school Reorganization Plan. In a second vote held on March 1, 2004, the School Board voted to accept the Plan by a vote of eight to five with District 2 Ward 2 member Dr. Bobby Wakefield Deshotel and District 6 Ward 3 member John David Landreneau changing their previous "no" votes

24. In passing, it is worth noting, that in order to comply with the Court's instruction to make sure that the committee had adequate African–American representation, the Superintendent had to go outside of the School System's central office as only one of the fourteen central office personnel was African–American.

25. School Board members were invited, but not required to attend the quarterly meetings. The minute entries memorializing the quarterly meetings reflect that on occasion some Board Members did attend. The entries also reflect that Mr. Eddie Gaudy, President of the Evangeline Chapter of the NAACP, attended every quarterly meeting.

26. As originally envisioned by the Court, as explained to the School Board at the January 2003 meeting, and as discussed with those who attended the quarterly meetings during which the process was developed, the Superintendent's Committee was to devise "plan A" that focused on use of existing facilities for implementation during the 2004–2005 school year and "plan B" that would provide for the construction of new schools and the renovation and improvement of existing schools in the event that the School Board was successful in getting the voters of Evangeline Parish to enact a tax/bond issue at some date after the 2004–2005 school year. Shortly after the Superintendent's Committee started their work on "plan A," the Committee requested that the Court allow them to defer any action on "plan B," so all of the Committee's energy could be expended on the daunting task of developing a constitutional plan using existing facilities for the 2004–2005 school year.

to "yes" votes. On March 5, 2004, the Evangeline Parish School Board filed a Motion For Authorization To Implement School Reorganization Plan. R. 111. After the hearing on Applicants' Motion to Intervene had been heard and the motion denied, the Court granted the School Board's Motion For Authorization To Implement School Reorganization Plan on March 25, 2004 which was unopposed by the parties. R. 134.

Applicants allege that the development of the Plan by the Superintendent's Committee violated their rights because the Court ordered that the development was to occur without input from anyone other than the Superintendent's Committee. They further allege that the School Board members accepted the Plan rather than develop their own plan because they were intimidated by the Court. The testimony of the individual Applicants during the March 15 and 16, 2004 hearing indicates their perception that the Superintendent's Committee developed the Plan in "secrecy" and that the School Board members accepted the Plan because they were intimidated by the belief that if it was not accepted the United States would develop a more stringent plan.

The record of this proceeding should leave no doubt that as a result of the negotiations that lead to the Superseding Consent Decree of June 28, 2001 and the representations made to the Court, to the attorney for the Evangeline Parish School Board and to the attorney for the original plaintiffs, the United States Department of Justice, in the event of the failure of the Evangeline Parish School Board to adopt and to implement a constitutional plan as it related to student assignment and facilities, would submit a plan of its own to the Court. The Court has to assume based on the government's representations, its dealings with the government in previous school desegregation cases, and the Presiding Judge's personal experience as a resident of Avoyelles Parish in 1988 [27] that any plan

submitted by the United States Department of Justice would have been a "much more stringent plan."

As to the allegations that the members of the Evangeline Parish School Board were intimidated by the Court to accept the plan proposed by the Superintendent's Committee rather than develop a plan of their own, the Court is aware, based on the on-the-record telephone conferences conducted prior to the March 15–16 hearing, regarding the scheduling of depositions and the extension of deadlines set out in the Pre–Hearing Procedures Outline of December 19, 2003, that counsel for Applicants for Intervention took the deposition of all thirteen members of the Evangeline Parish School Board. Only three members of the Evangeline Parish School Board testified at the hearing on the Motion for Intervention, including District 2 Ward 2 member Dr. Bobby Wakefield Deshotel, 03/16/04 Hearing, pp. 368–383, and District 6 Ward 3 member John David Landreneau, 03/16/04 Hearing, pp. 325–367, the two members who initially voted against the Superintendent's Committee's Plan at the February 18, 2004 School Board meeting and who changed their vote and voted in favor of the Plan at the March 1, 2004 meeting. Dr. Deshotel testified that he changed his vote because, "I had lied to my people, or deceived them a better word. That same afternoon that I voted for the—against the Plan, I had told my principals I would vote for the Plan. And my principals were in the meeting that night. I voted just the opposite of what I told them. And I felt that in all these years, I had deceived them by telling them that, and that's why I wanted to change it." 03/16/04 Hearing, p. 372, ll. 1–8. Mr. Landreneau testified he changed his vote, "Because I voted the way my constituents that put me in office wanted me to vote because my district was left alone." 03/16/04 Hearing, p. 344, ll. 6–7. The third member of the Evangeline Parish School Board to testify

---

27. In *United States v. Avoyelles Parish School Board*, Civil Action number 12,721, filed on March 2, 1967, after the failure of the Avoyelles Parish School Board to come up with a constitutional plan, on July 7, 1988, Judge Nauman S. Scott entered an order that reduced the total number of schools in the parish from nineteen to twelve for the 1988–1989 school year, including reducing the number of High Schools (9–12) from eleven to three, closing the high schools in Bordelonville, Cottonport, Effie, Fifth Ward, Hessmer, Mansura, Plaucheville and Simmesport.

was District 1 Ward 1 member Lonnie Dale Sonnier who voted against the Plan at the February 18th and March 1st meetings. 03/16/04 Hearing, pp. 482–504.

The Court is not privy to the testimony given during the discovery depositions of the ten members of the Evangeline Parish School Board who were not called to testify during the March 15–16 hearing. By their failure to be called as witnesses to testify, although most were in attendance during the entire two day hearing, the Court can only conclude that the testimony of the other ten members of the Evangeline Parish School Board would not have added anything to substantiate Applicants' belief that the members of the School Board were intimidated by the Court into voting for the Superintendent's Committee's Plan rather than submitting an alternative plan of their own.

The record of this proceeding clearly indicates that the Court instructed the Superintendent's Committee and the School Board attorney to draft a reorganization plan without outside input so that a plan could be presented to the School Board that was constitutional, educationally sound and to the extent possible, respected the cultural integrity of the towns and villages that makeup Evangeline Parish. The record further indicates that upon completion, the Plan was provided to the School Board members for their review and comments. *Id.* Thereafter, six public meetings were conducted parish wide to provide information about the Reorganization Plan and to allow for public comment. After completion of the public meetings, the School Board voted on February 18, 2004 to reject the Reorganization Plan by a vote of seven to six. Ultimately, on March 1, 2004, the School Board rescinded its previous vote and approved the Plan by an eight to five vote. The testimony of the Applicants confirms they were aware of and attended the public meetings and were provided the opportunity to give input and make comment about the Plan. Testimony of Kirk Guillory, p. 221, ll. 2–25; p. 222, ll. 1–14; Testimony of McCaully, p. 259, ll. 1–9; Testimony of Gail

McDavid, p. 288, ll. 1–25; p. 289, ll. 1–14. The testimony of Applicants further confirms that although they had known for some time that the Superintendent's Committee was in the process of developing a reorganization plan, Applicants did not attempt to contact counsel for the United States in order to discuss any aspect of student body desegregation before filing their motion to intervene. Testimony of Kirk Guillory, p. 224, ll. 1–20; Testimony of McCaully, p. 258, ll. 12–24; Testimony of Gail McDavid, p. 264, ll. 1–13; p. 265, ll. 1–21; p. 291, ll. 3–25; p. 292, ll. 1–3. Applicants testified that they were against the Plan because it involved busing children in a school system they believed to be unitary. *Id.;* Testimony of McCaully, p. 234, ll. 14–25; p. 241, ll. 10–18. While each of the Applicants testified that they had knowledge of the *Green* factors [28] used in determining unitary status in a desegregation lawsuit, none could identify the *Green* factors or the issues which must be considered in determining whether a school system is unitary. Testimony of McCaully, p. 251, ll. 10–25; p. 252, ll. 1–25; p. 253, ll. 1–15; Testimony of Gail McDavid, p. 285, ll. 18–25; p. 286, ll. 1–8. Applicants also stated they were not against desegregation; however, when asked about remedying a school with 99% white racial makeup in a school system with 60% white racial makeup, the testimony was evasive at best. Testimony of Kent Guillory, pp. 454–65, ll. 2–18. Applicants further testified that they had concerns about the school system in areas of desegregation other than student assignment, such as facilities and staff assignment. Testimony of McCaully, p. 250, ll. 23–p. 251, ll. 9; Testimony of Gail McDavid, p. 286, ll. 9–25. Finally, the testimony confirms that Applicants knew that the School Board had the option of rejecting, accepting or modifying the Plan presented by the Superintendent's Committee, as demonstrated by the five School Board members who ultimately voted against accepting it. Testimony of Ardoin, p. 393, ll. 9–12.

Applicants for Intervention have failed to produce evidence that the United States

---

28. The court must consider six factors in determining unitary status: (1) transportation; (2) extracurricular activities; (3) facilities; (4) faculty desegregation; (5) staff desegregation; and,

(6) student assignments *Green v. County Sch. Bd. of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

and/or the Evangeline Parish School Board had any motivation or interest different from that of the Applicants. Moreover, no evidence has been offered to show there was any collusion between the existing parties, no nonfeasance by the School Board, and no interest on the part of the School Board or the United States substantially adverse to that of Applicants. *See, e.g., Davis v. East Baton Rouge Parish School Bd.,* 721 F.2d 1425, 1432 (5th Cir.1983)(The court ordered closed door negotiations to develop a desegregation plan). To the contrary, since the ultimate objectives of the existing parties and Applicants for Intervention are identical, the presumption is that the interests of Applicants will be adequately protected. *Ordnance Container Corp. v. Sperry Rand Corp.,* 478 F.2d 844, 845 (5th Cir.1973). Applicants, therefore, have not overcome the presumption of adequate representation, and the record evidences that the United States and the School Board have in the past adequately represented the interest of Applicants for Intervention and will continue to do so in the future. The Court, therefore, finds that Applicants for Intervention are not entitled to intervene as a matter of right.

*2. Rule 24(b)—Permissive Intervention*

Applicants for Intervention argue in the alternative that the Court should permit them to intervene under Rule 24(b), which provides the following:

> Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. Fed.R.Civ.P. 24(b).

Permissive intervention is a two stage process. First, the Court must decide whether one of the grounds for such intervention exists under Rule 24(b). *See Stallworth v. Monsanto Co.,* 558 F.2d 257, 269 (5th Cir. 1977). If this threshold requirement is met, the Court must then exercise its discretion in deciding whether intervention should be allowed. *Id.*

■■■ Once again, under Rule 24(b)(1), Applicants have failed to identify a statute of the United States that confers a conditional right to intervene. The Court will, therefore, address the parameters of Rule 24(b)(2). Permissive intervention "is wholly discretionary with the [district] court ... even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied." *Kneeland v. National Collegiate Athletic Ass'n(Three Cases),* 806 F.2d 1285, 1289 (5th Cir.1987). Permissive intervention, as Rule 24(b)(2) provides, is appropriate in circumstances in which: (1) the application is timely; (2) the moving party's claim or defense and the main action have a common question of law or fact; and (3) the proposed intervention will not unduly delay or prejudice the adjudication of the original parties' rights. An additional factor courts may consider in determining permissive intervention is "whether the intervenors' interests are adequately represented by other parties." *Id.* at 1288. In its preceding analysis under Rule 24(a)(2), the Court found that Applicants for Intervention had not overcome the presumption of adequate representation on the part of the School Board or the United States. The testimony of the Superintendent of Evangeline Parish Schools indicated that, to be implemented for the 2004–2005 school year, the Reorganization Plan had to be approved by the Court no later than April 1, 2004. March 18, 2004 Hearing, p. 15, ll. 8–25; p. 16, ll. 1–3; p. 29, ll. 14–20. Applicants submit that prior to implementing any desegregation plan, a hearing on unitary status should be conducted. If the School System is not unitary, then Applicants should be allowed to develop or engage in developing another plan. Clearly, the proposed intervention would delay the continued efforts to desegregate the Evangeline Parish Schools. Accordingly, the Court will deny Applicants for Intervention's motion for permissive intervention pursuant to Federal Rule 24(b).

## XI.

*WHEN WILL THIS CASE COME TO AN END? WHEN WILL THE EVANGELINE PARISH SCHOOL SYSTEM BE DECLARED UNITARY?*

When will this case come to an end? When will the Evangeline Parish School Sys-

tem be declared unitary? Two very fair questions, the answers to which all citizens of Evangeline Parish are entitled to receive. Unfortunately, answers which this Court cannot give. The answers to these two questions can only be given to the people of Evangeline Parish by the members of the Evangeline Parish School Board, present and future.

However, three things should be crystal clear to even the casual reader of this narrative: (1) regardless of what the reader thinks of the Presiding Judge and/or his actions in this case since the status conference of May 30, 2001 *this case has the Judge's full and complete attention;* (2) the Judge is totally committed to eliminating the *de jure* segregation and the vestiges of that segregation that currently exist in the Evangeline Parish School System to the extent practicable, and to the returning of the School System to the control of the Evangeline Parish School Board as soon as that has been accomplished; and (3) the United States Department of Justice, by its actions in this case since it completed its investigation of the Evangeline Parish School System and the filing of its motion for a status conference on May 11, 2001, is not going to return its file on Evangeline Parish to the aging filing cabinet where it resided, unattended for many of the thirty-nine plus years of this case, until the vestiges of segregation in the Evangeline Parish School System are in fact eliminated.

## XII.

### THE MEANING OF GOOD FAITH IN THE CONTEXT OF A SCHOOL DESEGREGATION CASE

The term "good faith" can be an illusive concept for one to get his or her hands around. Good faith on a given issue can, and often does mean different things to different people. However, in the context of this school desegregation case, any school desegregation case, the concept of good faith has been enunciated many times and its meaning in 2004 is understood and unmistakable. The United States Supreme Court stated in *Freeman*, 503 U.S. at 491–92, 112 S.Ct. 1430,

Among the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; *whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.* (emphasis added).

In considering these factors, *a court should give particular attention to the school system's record of compliance.* (emphasis added). A school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations. And, with the passage of time, the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish, and the practicability and efficacy of various remedies can be evaluated with more precision.

The United States Court of Appeals for the Fifth Circuit addressed the issue of good faith in *Hull v. Quitman County Board of Education, et al,* 1 F.3d 1450, 1454 (5th Cir.1993).

This court used to evaluate termination of desegregation decrees under the global inquiry whether the school district had achieved 'unitary' status. *See, e.g., Monteilh [v. St. Landry Parish School],* 848 F.2d [625]at 629 and n. 7 [(5th Cir.1988)] (citing cases). *Freeman* and *[Board of Education of Oklahoma City Public Schools v.] Dowell[,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991)] make clear, however, that there is no longer magic in the phrase unitary status, which had spawned much uncertainty and a conflict among the circuits. *See* Comment, 2 Seton

Hall Const. L.J. 337 (1991). Following *Freeman,* the lower courts have discretion to terminate a desegregation case *if a school board has consistently complied with a court decree in good faith and has eliminated the vestiges of past discrimination to the extent 'practicable.'* (emphasis added). Freeman created a framework in which equitable decrees will not remain in effect perpetually and school districts can be returned to local control. We believe the same considerations good faith compliance, practicability of further desegregation, and local control are also pertinent to determining whether a particular school board action, in a district that has long lived with a desegregation decree but failed to seek dismissal of the case, sufficiently comports with the goals of the decree. *The tests of practicability and good faith should inform, as they did here, a district court's exercise of its equitable powers where a desegregation decree has been in effect for some years.* (emphasis added).

## XIII.

*EVIDENCE OF GOOD FAITH SINCE THE ADOPTION OF THE SUPERSEDING CONSENT DECREE OF JUNE 28, 2001*

### A. The Evangeline Parish School Board

There is no question that it took some degree of courage for each of the eight School Board members who voted on March 1, 2004 in favor of the Superintendent's Committee's Plan for the reorganization of the Evangeline Parish Schools. Much more courage from some School Board members than for others based on how or even if the Plan affected the schools in the districts from which the members were elected; that in no way takes away from the significance of the vote. The School Board vote of March 1, 2004 is a major accomplishment, perhaps a turning point in the Evangeline Parish School Board's effort in light of its sordid history and recalcitrant efforts by previous School Boards and Superintendents of this thirty-nine year old case. The School Board demonstrated at last to the public and to the parents and students of the once disfavored race, the African–American citizens of Evangeline Parish, particularly the African–American citizens of Ville Platte, their good faith commitment to the whole of the Court's June 28, 2001 Superseding Consent Decree and previous orders, and to those provisions of the Constitution that were the predicate for judicial intervention by this Court on June 4, 1965.

Other votes by the School Board demonstrated courage and laid the foundation for the successful implementation of the Plan for the 2004–2005 school year that commenced August 13, 2004; this despite the nay-sayers, unfortunately some of the most vocal of whom were and are School Board members. Illustrations of School Board votes that took courage were:

(1) 2003

(a) at the recommendation of the Superintendent, the vote to place all of the System's schools on a five day week;

(b) at the recommendation of the Superintendent, the vote to place all of the System's elementary schools on a six period day;

(c) at the recommendation of the Superintendent, the vote to place all of the System's high schools on a seven period day; and

(d) at the recommendation of the Superintendent, the vote to reassign principals and assistant principals for the 2003–2004 school year.

(2) 2004

(a) at the recommendation of the Superintendent, the vote to reassign principals and assistant principals to implement the Reorganization Plan adopted by the Board on March 1 as approved by the Court on March 25; and

(b) the May 19 vote, extending the contract of Superintendent Fontenot for an additional two years due to the notoriety surrounding the Reorganization Plan and the Superintendent's role in the Plan's development.

Each of these votes caused acrimony between the members of the School Board and some segments of the public, depending on

the issue or the affected school. But each time, a majority of the School Board did what it needed to do, if only by a 7-6 vote.

The March 1, 2004 vote adopting the Reorganization Plan is also an affirmation of Superintendent Fontenot's leadership. It is also a tribute to the men and women, public servants of the highest order, who aren't paid nearly enough for the responsibility they have for the citizens of Evangeline Parish's children and with what they have to put up, sometimes from the public, but more often from individual School Board members, just to do their jobs in the School System's central office.

That is not to say that the Evangeline Parish School System is near unitary status or even partial unitary status as of this writing. A turning point *perhaps,* but a turning point does not mean that the School Board has turned the corner.

A major issue of the original plaintiffs, of the Department of Justice and of this Court is the condition of Ville Platte High School which has been neglected by the School Board for decades. During those years of neglect, many of the Ward 1 Caucasian School Board members' children, along with most of the other Caucasian children from Ville Platte, attended and today attend a nearly all white private religious school in Ville Platte.

With attorneys for the parties, the members of the School Board, and the Court presently fully aware of their respective roles in this case and their individual and collective duties and obligations under the orders of the Court and of the United States Constitution, it will be interesting to see hence forth how each of the members of the School Board discharge his/her *individual* and collective duty.

The reader should be advised that all School Board members are *now* required to attend the quarterly meetings in the wake of six hearings held in connection with the Reorganization Plan. All quarterly meetings are *now* conducted in open court, on the record. The Presiding Judge encourages all elected officials of Evangeline Parish, all citizens of Evangeline Parish, especially those who have an interest in education and an interest in

the issue or the affected school. But each time, a majority of the School Board did what it needed to do, if only by a 7-6 vote.

this litigation being concluded, to come to Lafayette and observe your School Board, the United States Justice Department, the United States Attorney and this Court discharge the duties under their respective Oaths of Office.

It has been this Court's observation over the last three and one half years that members of the Evangeline Parish School Board, like members of most rural school boards in Louisiana, perhaps like most members of elected school boards everywhere, build alliances among themselves based on commonality of interest on a particular issue or issues that affect a school, or a situation or issues that the member perceives to affect a school located in the district he or she represents. These alliances are built on sand, shifting sands, rather than philosophical beliefs or ideologies and not necessarily on what is good for the School System as a whole. Indeed, the writer suspects that since its March 1, 2004 vote on the Reorganization Plan, those who voted for or against the Plan have not voted again in that same eight to five configuration on any other issue. Perhaps a good thing, perhaps not. Time will tell if at least a majority of the present members of the Evangeline Parish School Board are dedicated to the full implementation of the Superseding Consent Decree of June 28, 2001 and the Reorganization Plan they adopted on March 1, 2004 and now, by its March 25, 2004 adoption, is the order of this Court. Only the passage of time will reveal if future School Boards and Superintendents of the Evangeline Parish School System are as committed as those eight members were on March 1, 2004 when they voted for the Reorganization Plan.

### B. A Missed Opportunity by the Evangeline Parish School Board

There have been a number of missed opportunities on the part of the School Board over the last three and one-half years. In the writer's view, the greatest missed opportunity occurred recently on July 21, 2004 when the School Board rescinded its previous vote of June 2, 2004 to place a bond issue on the November 2, 2004 ballot for the construc-

tion of a new school to serve the communities of Ville Platte and Chataignier. The view of the majority of the School Board was that the November 2, 2004 election, which will quite likely have the largest voter turnout in Evangeline Parish for a generation to come,[29] was not a time to try to pass a bond issue. The majority view of the School Board was that a stand-alone election in January or March of 2005 would be the most opportune time to pass the bond issue despite the defeat of the last stand-alone School Board tax on May 1, 1999, by a margin of 71% to 29%.

A successful vote on November 2, 2004 (or for that matter in January or March 2005) would speed up by a factor of at least ten, the time when the Evangeline Parish School System could be declared unitary and released from Federal Court oversight.

By not affording the people of Ward 1 the opportunity to vote on November 2 to construct a new school, and the Court's concern that a stand-alone election on the issue in January or March 2005 will not succeed, the School Board forced the Court to request that the Department of Justice retain a facility expert.[30] Frank Brewer was retained to determine what needs to be done and *what must be done* at Ville Platte High School to make it safe and as conducive to the education process as possible. For at least three decades, based on the record of this case, Ville Platte High School has been terribly neglected.

There are several unfortunate and unintended consequences in the School Board's decision to deny the most people in Ward 1 the quickest opportunity to vote for or against the construction of a new school. First, the School Board, the United States Department of Justice and this Court, to discharge the duties of their respective Oaths of Office, will have to make sure the School Board devotes all available revenue, including the Board's surplus, to make the aged, neglected Ville Platte High School into as good a physical facility as possible. Second, the other schools in Evangeline Parish, some

of which are currently in need of attention, will not receive that attention. Third, and most regrettable from the Court's view, there will be little or no opportunity, other than appropriations from the State of Louisiana, to give badly needed pay raises to teachers, principals, assistant principals, administrators, central office staff and support workers such as aides, bus drivers, custodians and cafeteria workers until Ville Platte High School is renovated. According to Mr. Brewer the day after his initial tour of the school, due to Ville Platte High School's age and neglect, it can never be better than "third rate," at best "second rate," no matter how many millions of tax payer dollars are spent in the school's renovation.

### C. School System Administration—Superintendent of the Evangeline Parish System, Rayford J. Fontenot

In 1999, a book of poetry by Charles Bukowski, one of America's better known contemporary writers of poetry and prose of the last quarter of the Twentieth Century was published entitled, "What Matters Most Is How Well You Walk Through The Fire." A great title; a great concept. A concept that one might argue applies to each of us every day of our lives. Certainly a concept, even if only idealistically, perhaps naively one would hope applies to those who serve in leadership capacities be they business, civic, political, even religious.

When this Court signed the Superseding Consent Decree on June 28, 2001, Rayford J. Fontenot had been the Superintendent of the Evangeline Parish School System for one day. He had not been a part of the negotiations of the Decree between the School Board attorney, the Department of Justice attorneys and the Court. There was no way for the Court to know what kind of man he was or what kind of Superintendent he would be.

As stated earlier, the Court's rational and clear intent by the insistence of several of the provisions of the Superseding Consent De-

---

**29.** The November 2, 2004 election will select the President of the United States, an open United States Senate seat and open United States House seat.

**30.** *See,* the Court's 9/3/04 Order regarding the hearing in open court conducted in this case on July 30, 2004.

# 445

cree was to place not only the *authority* but the *responsibility* for the implementation of the terms of the Decree and the orders of this Court in the hands of one person. By the terms of the Superseding Consent Decree, that one person, because of his appointment as Superintendent by the School Board the previous night, was Rayford J. Fontenot. As a result of the Decree, the new Superintendent had more power, but also much more responsibility, especially responsibility to this Court, than any previous Superintendent in the history of the Evangeline Parish School System.

It is this Court's firm belief that the good people of Evangeline Parish and many within the School System do not fully understand or appreciate the true worth and the quality of the man who has guided their schools for the last three years. At the risk of hyperbole, but as true a statement as this Judge has ever penned, *I have not personally known a more honorable man than Rayford J. Fontenot.* He has been subjected to inordinate ridicule and scorn, not only by the public who does not have all of the facts, but also from individual members of the School Board who have been given the information available about the School System's legal plight, the School System's obligation as well as the School Board members *individual* obligation under the Superseding Consent Decree of June 21, 2001. Such inexcusable behavior by members of the School Board has been for their own political advantage.

Superintendent Fontenot has always responded with reserve and dignity when lesser men would have responded otherwise.

Superintendent Fontenot has never, in the slightest manner, in any way, tried to hide, confuse or mislead this Court on any issue concerning this litigation. He has always done his duty.

Superintendent Fontenot is an educator, not a politician. If a majority of the School Board continues to follow the Superintendent's lead, and let him do his job, the Court has no doubt that the Superintendent will not only lead the School System out of this case and out from under Federal Court Supervision, he will also lead the Evangeline Parish School System toward excellence in the education of the children of Evangeline Parish.

Even with the shifting sands on which the members of the Evangeline Parish School Board stand, two members, Ward 1, District 12 member, Gervis L. Lafleur, and Ward 3, District 3 member, Cecil A. Monier, need to be acknowledged for the critical role they played, at great personal political risk to each, by not taking a pass and voting not once, but twice, for the Reorganization Plan, a plan that greatly affected their respective districts. Mr. Lafleur who happens to be African–American and Mr. Monier who happens to be Caucasian each faced re-call efforts, both unsuccessful, and experienced many indignities from family and life-long friends for the courageous stand they took in simply doing their duty, based on the information they had, under their Oaths of Office. Both Mr. Lafleur and Mr. Monier displayed uncommon courage.

History should record the role of Superintendent Fontenot and of School Board members Lafleur and Monier. Hopefully this narrative will, in part, memorialize how well each of these men, when it was their time, "walked through the fire."

## XIV.

### *CONCLUSION*

Was there a method to what may have appeared to some in Evangeline Parish, as the "madness of the judge," in the way he dealt with their School Board over the last three and one-half years? Absolutely. Was the method employed by the Judge since May 30, 2001 in the discharge of his duty under his Oath of Office the only way he could have proceeded? Absolutely not. Was there a better way for a smarter judge to have proceeded? Probably. Was it the best this judge could do? It absolutely was.

Wish that this Court had the power some in Evangeline Parish think that it has. If it did have that power, the Court could immediately bring the Evangeline Parish School System into unitary status and return its control to the Evangeline Parish School Board. However, even if such were possible, it would only correct the structural problem,

the only problem that this Court, any United States Court, should attempt to address in a school desegregation case.

No decision by this Court, by the United States Court of Appeals for the Fifth Circuit or even by the United States Supreme Court can change the hearts of our people. That type of change requires a much higher power than any court possesses.